Leonard K. HIATT, Robert A. Bagby, Marvin Crabaugh, Gary W. Boatright, Ronald L. Roberson, Carl D. Houk, Jerrold B. Hutchings, Duane K. Hinkle, Larry L. Burback, Stephen J. Miller, Kim R. Hardman, Kenneth R. Covington, Michael E. Valentine, Gary L. Yanken, Patrick M. Herrley, Mike I. Carlson, Randall O. Swarthout, Sammy L. Cross, Darrell D. Miller, Ronald L. Stoddard, James D. Tolle, Larry S. Clark, Robert T. Epler, Richard W. Cavender, Dale Young, Robert F. McIntosh, Julian R. Nelson, Walter T. Gronek, Ronald E. Ostendorf, Ronald R. Johnson, Melvin E. Sayre, Robert F. Lannon, Gerald T. Dueling, Philip J. Eberhardt, Roxie L. Jackson, Russell P. Eggers, Ron G. Van Nortwick, Thomas M. McMurtry, Larry R. Mann, Maurice F. McDonald, Donald A. Raschke, Cleo D. Schroeder, Kenneth W. McIntosh, Robert A. Podjenski, Gilbert R. Throm, Donald K. Peters, Robert G. Wenzel, Cecil B. Miller, Leroy W. Roth, James L. Wells, Charles F. Smartt, James W. Jenkins, John J. Sta-mate, Gerry W. Spinden, David E. Dupree, Donald R. Smith, James P. Manary, Ronald B. Hunt, Robert E. Williams, Dennis J. Smith, Gary E. Metcalf, Benny L. Covington, Robert E. Wedgwood, Norman R. Thomas, Jon L. Stone, Steven L. Brown, John R. Holloway, Warren H. Bush, Edward W. Berardino, Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY, a Utah Corporation; and United Transportation Union, Defendants.

Jerome J. SMITH, Michael R. Ramold, Michael X. Kosmicki, Richard J. McCune, Daniel L. Eastman, Donald E. Looker, Robert A. Harger, Steven L. Burbach, Donald S. Seghi, Roland G. Beard, Earl J. Vance, Bruce O. Stafford, Richard K. Loehning, Jr., Tracy B. Miller, Gary L. Jones, Robert M. Hagy, William A. Myers, Gene F. Noonan, Kenneth J. Puchalski, Robert L. Keenan, Robert F. Garland, David A. Growe, Michael P. O'Neil, Timothy J. Hoppe, Albert G. Kelsch, Steven F. Massey, John M. Crawford, Tarrell L. Newman, Bill G. Hamilton, Verl W. Moore, Charles W. Rohe, Albert W. Greenwood, Gerald A. Gompert, Gary L. Katiepolt, Dick C. Jones, Jon Lutz, Charles D. Barnhill, Larry G. Wright, Thomas W. Schaefer, John C. Rosenstock, Steven E. Bishop, Roger G. Mazanec, Edward Jay Dietz, Steve V. Brew, Lavern L. Brown, Donald Masek, Donald Rosekrans, Robert H. Hall, Jack A. Reighard, Roger E. Rohrbouck, James Moritz, Harold Jones, Plaintiffs,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, a Delaware Corporation; and United Transportation Union, Defendants.

Nos. 93–CV–0209–B, 93–CV–0210–B.

United States District Court,
D. Wyoming.

Aug. 3, 1994.

Richard Rideout, Cheyenne, WY, and John W. McKendree, Denver, CO, for plaintiffs.

John B. Rogers, Robert G. Pickering, Cheyenne, WY, Brenda J. Council, Union Pacific R. Co., Omaha, NE, Keven C. Brodar, United Transp. Union, Cleveland, OH, for defendants.

### *ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

BRIMMER, District Judge.

The above-entitled matter having come before the Court on the Defendants' Motions to Dismiss or, in the alternative, for Summary Judgment, the Plaintiffs' Combined Opposition thereto, as well as the supplemental briefs of the parties as per this Court's order, and the Court, having reviewed the materials in the file, having heard oral argument from the parties and being fully advised in the premises, hereby FINDS and ORDERS as follows:

#### *Background*

This case revolves around the interpretation and effect of an act of Congress which was signed into law on April 18, 1991, by then-President George Bush. *See* Pub.L. No. 102–29, 105 Stat. 169 (1991). The complaints in these two cases, which have been consolidated for pretrial purposes by an order of this Court, were filed by former employees of defendants Union Pacific Railroad ("UPRR") and Burlington Northern Railroad

("BNRR"). The plaintiffs named UPRR, BNRR and the United Transportation Union ("UTU") as defendants in these actions. All of the named plaintiffs had been employed by the defendants as brakemen until they were forced to accept mandatory promotions to conductor. It is this mandatory promotion issue that is at the heart of these disputes.

The complaints allege that the actions of the defendants in implementing certain portions of Public Law 102–29, namely the "crew consist procedures," discriminated against the plaintiffs on the basis of their age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (1988) ("ADEA"). The plaintiffs seek a declaratory judgment that the defendants' actions violated the ADEA, a prospective injunction against further violations, an order directing the defendants to take affirmative steps to eliminate the effects of their actions, an order reinstating their brakemen's seniority and compensatory damages, attorneys' fees and costs.

All three defendants have filed motions to dismiss or, in the alternative, for summary judgment, with respect to the complaints. Before the Court can address the merits of these motions, however, it is necessary to review the relevant statutory framework and the events that formed the basis for these suits.[1]

### A. The Railway Labor Act

The labor dispute that led to the present litigation requires an understanding of the congressionally designated procedures for resolving labor disputes in the railroad industry and the negotiation and collective bargaining processes.

The Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq. (1988) regulates the process of collective bargaining in the railroad industry. It establishes a multi-tiered process by which either party to a collective bargaining agreement may formally propose to change the terms of an existing agreement.[2] This formal procedure requires a party proposing a change to the agreement to serve a notice pursuant to § 6 of the RLA. *Id.* § 156. After service of a § 6 notice, the RLA requires the parties to enter into negotiations regarding the proposed changes to the collective bargaining agreement. If the parties cannot reach an agreement, then they may invoke the statutorily defined assistance of the National Mediation Board ("NMB"). *Id.* § 155. If the NMB is unsuccessful in mediating an agreement, then the parties may submit the dispute to binding arbitration. *Id.* § 157. If arbitration is not pursued, and the NMB believes that the failure to reach an agreement may threaten interstate commerce, then the NMB is required by statute to notify the President of this situation. *Id.* § 160. The President is then authorized to appoint a Presidential Emergency Board to investigate the matter and issue a recommendation. *Id.*

Of course, one obvious problem with the procedures contained in the RLA is in the absence of any limits on the number of § 6 notices that may be served by any party to a collective bargaining agreement. Thus, the parties could, in theory, seek to renegotiate the terms of their collective bargaining agreements *ad infinitum.* In an effort to avoid this possibility and to bring some stability to these agreements, the parties to these agreements (the carriers and the unions) often place a moratorium clause within their agreements. These moratoria provisions are simply bilateral agreements whereby each side agrees that it will not invoke the RLA procedures to reopen negotiations on a particular aspect of a collective bargaining agreement for a specific period of time.

---

**1.** An excellent summary of the history and background of the present dispute can be found in two opinions from the federal courts in Washington, D.C.. *See Burlington N.R.R. Co. v. United Transp. Union et al.,* 822 F.Supp. 797 (D.D.C. 1991), *aff'd sub nom. United Transp. Union v. United States,* 987 F.2d 784 (D.C.Cir.1993). The District of Columbia litigation involved an unsuccessful challenge by the UTU to the constitutionality of Public Law 102–29 under Congress' Article I Commerce Clause power. *See* U.S. Const. art. I, § 8, cl. 3.

**2.** Negotiations can occur at either the local or the national level. Local negotiations typically involve one railroad and one or more unions; in contrast, national negotiations occur between multiple railroads and unions, and are referred to in industry parlance as "national handling." *See Burlington Northern,* 822 F.Supp. at 799.

B. *The History of the Present Cases*

### 1. *Background*

In 1980, Congress passed the Staggers Rail Act, Pub.L. No. 96–448, which essentially deregulated the rail industry. Since that time, the nation's major rail carriers, including defendants UPRR and BNRR, have attempted to reduce the size of their train crews. Historically, the number of men necessary to form a crew was determined by what are known as crew consist agreements. A traditional train crew consisted of an engineer, a conductor, a fireman and either two or three brakemen. Due to technological advances, however, including the advent of the diesel locomotive, the positions of fireman and third brakeman have become obsolete and have been virtually eliminated. *See Brotherhood of R.R. Trainmen v. Akron & Barberton Belt,* 385 F.2d 581, 588–92 (D.C.Cir.1967).

The present litigation began when the unions and the carriers entered into a crew consist agreement on December 5, 1980. This agreement provided that all standard road freight and yard crews would consist of "not less than" one conductor and two brakemen. Subsequent reductions in these positions was to be entirely on the basis of attrition. The parties also agreed to a moratorium with respect to the crew consist aspect of this agreement for a specified period of time.

The carriers, however, have recently demonstrated an increased resistance to the brakeman's position because of their belief that its function is obsolete. As a result, the carriers have attempted to eliminate as many of those positions as possible for obvious economic reasons. Unfortunately for the carriers, reduction by attrition has been too slow and the moratoria provision in the crew consist agreement has prevented the carriers from attempting to reopen negotiations on this issue. As a result, the carriers have retained what they perceive to be the excess brakeman's positions.

In July of 1988, a majority of the UTU's local arms served § 6 notices on the carriers in an effort to modify particular portions of the then-existing collective bargaining agreements. Specifically, the unions sought to improve the wages and health care benefits of their members, which included almost all of the firemen, conductors, brakemen, yardmen and yardmasters employed by the carriers. The service of the § 6 notices opened the negotiations process described above, but only with respect to the matters designated therein.

In October of 1988, the carriers filed their own § 6 notices which contained a counterproposal seeking dramatic wage cuts for its employees. Sensing an opportunity to renegotiate the important crew consist issue, the carriers offered an alternative proposal: a smaller wage cut than the one initially proposed in exchange for the unions' agreement to reopen negotiations on the crew consist matter. The carriers' intent to reduce the number of brakemen by reopening the negotiations on that issue was plainly apparent from their § 6 notices, which stated that they wanted to require any train service employee to accept a promotion to conductor and/or engine service or forfeit their seniority and terminate the employment relationship.

This so-called "mandatory promotion" requirement forms the basis for the complaints filed in this case. The carriers sought to reduce the number of brakemen while at the same time increasing the number of conductors, a position that was undermanned, by promoting the extra brakemen to conductor status. The unions, however, refused to consent to renegotiate the crew consist agreements, relying on the moratoria provisions to prevent renegotiation of this issue. Thus, the dispute was now ripe to move to the national handling phase.

### 2. *The National Level*

At the national level, the local unions were represented by the UTU, and the carriers were represented by the National Carriers' Conference Committee ("NCCC"), the bargaining arm for national negotiations for the National Labor Railway Conference, an association of the nation's major carriers. It became readily apparent that the negotiations at this level were not going to produce any results, and the parties thereafter sought the assistance of the NMB. The NMB's year-long effort to mediate this dispute also

failed to improve this stalemate. The parties subsequently refused to submit their dispute to arbitration. At that point, the NMB certified to President Bush that this dispute could in fact threaten interstate commerce.

On May 3, 1990, President Bush, acting pursuant to his statutory grant of authority, see 45 U.S.C. § 160 (1988), and in accordance with the recommendation of the NMB, appointed Presidential Emergency Board 219 ("PEB" or "the Board") to investigate the dispute between the carriers and the unions and to issue a recommendation. See EXEC. ORDER No. 12714, 55 Fed.Reg. 19,047 (1990).

The Board conducted extensive hearings and heard testimony from numerous interested parties. Both the UTU and the carriers argued the mandatory promotion issue before the Board. The UTU vehemently opposed this proposal while the carriers argued that it was necessary because there were too many brakemen positions that were no longer needed and which they were being forced to fund, while they were simultaneously suffering from a shortage of conductors. Thus, the carriers claimed that the requirement that brakemen accept a promotion to conductor status would be more efficient and would eliminate the excess brakemen.

On January 15, 1991, the Board issued its report and recommendations to President Bush. The Board recommended that the carriers' proposal for a wage cut be rejected, and furthermore, that a series of wage increases be given. In return for the wage increases, however, the Board recommended that the moratoria provisions of the earlier crew consist agreements be lifted, that the parties be permitted to serve § 6 notices locally on the crew consist issue and that a new round of negotiations on this issue take place. The Board also recommended that the disputes should be subject to binding arbitration unless the parties voluntarily reached new crew consist agreements by October 31, 1991. Finally, and perhaps most significantly for purposes of this case, the Board adopted the carriers' position on the mandatory promotion issue and recommended that "all brakemen who are offered promotion to conductor should be required to accept such promotion."

Acting on these recommendations, the carriers then served their § 6 notices seeking to renegotiate the crew consist agreements. Although some of the parties voluntarily reached agreements, others did not. On April 17, 1991, the inability to agree on these matters culminated in a strike by the unions and the UTU. Later that same day, Congress intervened and enacted what was essentially the Board's recommendations. The bill containing these recommendations was passed by the House of Representatives and the Senate and signed into law the next morning by President Bush. The bill is now codified as Public Law 102–29.

Section 2 of that law specifically required the President to appoint a special presidential board ("Special Board") which would be empowered to conduct additional hearings for the purpose of clarifying, interpreting, and, if necessary, modifying the recommendations of PEB 219, now Public Law 102–29, if the Special Board determined that they were demonstrably inequitable or materially erroneous. Certain provisions of Public Law 102–29 are directly relevant to this litigation. Under § 1(3), the findings of the Special Board were to become binding on the parties ten days after they were issued and those findings were to be given "the same effect as though arrived at by agreement of the parties" under the RLA. In addition, § 3(g) of the law provided that there shall be no judicial review of "any report or determination of the Special Board under this section."

Pursuant to this congressional mandate, President Bush appointed a three-member Special Board on July 18, 1991. The UTU appealed the Board's ruling on the mandatory promotion issue to the Special Board, but their appeal was rejected on the grounds that the Board's ruling was fair and not materially erroneous. The Special Board thus allowed the carriers to serve their § 6 notices to renegotiate their respective crew consist agreements at the local level. The carriers thereafter served their notices, and on October 25, 1991, BNRR and the UTU reached an agreement on the crew consist issue. UPRR and the UTU entered into a separate agreement on December 19, 1991. As expected, the terms of the new agreements

incorporated the mandatory brakemen promotion requirement.

It is this mandatory promotion language in the crew consist agreements that forms the basis for the present lawsuits. In short, the plaintiffs allege that the portion of the collective bargaining agreements requiring them to accept mandatory promotions to conductor status impermissibly discriminates against them on the basis of their age in violation of the ADEA.

### 3. *The Contentions of the Parties*

The plaintiffs allege that the requirement that they accept a promotion to conductor deprives them of their seniority within their craft.[3] They further argue that they relied on the earlier crew consist agreements in passing up opportunities for promotions to conductor at earlier dates since they were told that they would not be adversely affected if they declined to accept those promotions. In other words, they relied on the earlier agreements in order to preserve their accumulated brakeman's seniority; if they had accepted the earlier offers for promotions to conductor, then they would have more seniority than people who accepted a promotion to conductor after the plaintiffs passed up their opportunities. Finally, the plaintiffs argue that they have been treated less favorably since the mandatory promotions took effect, and that this less favorable treatment is due, at least in part,[4] to their age.

The defendants' argument is three-fold. Initially, they assert that they cannot be held liable for actions taken in accordance with a congressional mandate. As a result, they have moved for summary judgment pursuant

to Rule 56.[5] In the alternative, they contend that the crux of the plaintiffs' complaints involves disputes over seniority and wages and not age discrimination. These types of disputes, classified under the RLA as "minor disputes," *see Union Pacific R.R. Co. v. Sheehan,* 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (*per curiam*), are subject to the exclusive jurisdiction of the National Railroad Adjustment Board ("NRAB") which provides for compulsory and binding arbitration. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 303–04, 109 S.Ct. 2477, 2480–81, 105 L.Ed.2d 250 (1989). As a result, the defendants assert that this Court has no subject matter jurisdiction over these claims. *See Trainmen v. Chicago, R. & I. R.R. Co.,* 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957); *Watts v. Union Pacific R.R. Co.,* 796 F.2d 1240, 1242–43 (10th Cir. 1986). They assert that the plaintiffs cannot "artfully plead" their way around the conclusion that these claims are minor disputes and not age discrimination claims. Thus, they seek a dismissal pursuant to Rule 12(b)(1). Finally, the defendants assert that dismissal is warranted on the merits because the plaintiffs have failed to establish a prima facie case of age discrimination.

As far as the claims against the UTU, it should be pointed out that the plaintiffs' claims against this defendant are not predicated on an alleged breach of the duty of fair representation. Rather, the plaintiffs allege that UTU is liable for its participation in implementing a crew consist agreement that discriminates against the plaintiffs on the basis of their age.[6]

---

**3.** Seniority is based on a particular craft. Thus, UPRR and BNRR had separate seniority systems for their conductors, brakemen, firemen and yardmen. If, for whatever reason, an individual transfers from one craft to another, then he would essentially forfeit all of his seniority in that craft and he would start his new craft with no seniority.

**4.** The phrase "at least in part" is used because the plaintiffs have argued, *inter alia,* that the defendants have intentionally discriminated against them based on their age. In the alternative, however, they argue that this is a "mixed motive" case of discrimination and that while their age may not have been the deciding factor,

it was nonetheless a determining factor that motivated the defendant. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

**5.** Because the parties have relied on materials outside of the complaint, the motion is more properly viewed as a motion for summary judgment, *see* FED.R.CIV.P. 12(b), rather than a motion to dismiss under Rule 12(b)(6).

**6.** The issue of whether the UTU breached its duty of fair representation was raised and decided in another federal action. In *Local 1389, United Transp. Union v. CSX Transp., Inc. et al.,* slip op.,

### Standard of Review

The standard for summary judgment is well-established and need not be recited in great detail here. *See Central Wyoming Law Assoc's, P.C. v. Denhardt,* 836 F.Supp. 793, 798 (D.Wyo.1993) (Brimmer, J.); *White v. Continental Gen. Ins. Co.,* 831 F.Supp. 1545, 1551–52 (D.Wyo.1993) (Brimmer, J.). "By its very terms, [the Rule 56(c) ] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

The trial court decides which facts are material as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510; *see also Carey v. United States Postal Serv.,* 812 F.2d 621, 623 (10th Cir.1987). Summary judgment may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Carey,* 812 F.2d at 623. The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Carey,* 812 F.2d at 623. In considering a party's motion for summary judgment, the court must examine all evidence in the light most favorable to the nonmoving party. *Barber v. General Elec. Co.,* 648 F.2d 1272, 1276 n. 1 (10th Cir.1981).

### Discussion

#### A. Subject Matter Jurisdiction

Because this Court must satisfy itself that it has subject matter jurisdiction over this

cause of action before it may reach the merits of the case, the Court will address this argument first.

■ The defendants' argument is that the plaintiffs may not circumvent the exclusive jurisdiction of the NRAB by recharacterizing their claims as something other than what they really are, which, according to the defendants, is nothing more than a minor dispute over wages and seniority. The defendants' claim rests on the "artful pleading" doctrine first enunciated in *Magnuson v. Burlington N., Inc.,* 576 F.2d 1367, 1369 (9th Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978) and followed in *Stephens v. Norfolk and Western Ry. Co.,* 792 F.2d 576, 580 (6th Cir.1986) and *Leu v. Norfolk and Western Ry. Co.,* 820 F.2d 825, 830 (7th Cir.1987). For reasons given below, this Court finds that this argument is misplaced and that this Court does in fact possess subject matter jurisdiction to hear and adjudicate the plaintiffs' claims.

■ Initially, it is a well-settled principle that "the party who brings suit is master to decide what law he will rely upon[.]" *See Drake v. Cheyenne Newspapers, Inc.,* 842 F.Supp. 1403, 1406 (D.Wyo.1994) (Brimmer, J.) (quoting *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913) (Holmes, J.)). Because the plaintiff is the master of the complaint, any attempt to preempt that party's decision as to the substantive law on which the claims in their complaint are predicated must be evaluated with great care.

■ In this particular area of the law, some courts have recognized that a plaintiff may not convert a minor dispute which would otherwise be non-justiciable by a court into a claim that is justiciable merely by pleading it as such. More specifically, the "artful pleading" doctrine provides that:

[e]mployees' attempts to evade NRAB exclusive jurisdiction over minor disputes by

1992 WL 675144 (E.D.Ky.Apr. 17, 1992), the plaintiffs brought a duty of fair representation claim against the UTU with respect to its representation of the union members during the proceedings culminating in Public Law 102–29.

The Court in that case granted the defendants' motions for summary judgment, finding that UTU did not breach its duty of fair representation.

recharacterizing their claims into *state causes of action* are scrutinized by the following test: [i]f the action is based on a matrix of facts which are inextricably intertwined with the grievance machinery of the collective bargaining agreement and of the R.L.A.[, then] exclusive jurisdiction of the NRAB preempts the action.

*Leu,* 820 F.2d at 830 (citations omitted) (emphasis added). The problem with the defendants' reliance on the artful pleading line of cases is that they all involve situations where the plaintiffs have attempted to characterize their claims as state law tort claims. *See Leu,* 820 F.2d at 830 (fraud and conversion); *Stephens,* 792 F.2d at 580 (wrongful discharge and intentional infliction of emotional distress); *Magnuson,* 576 F.2d at 1368 (intentional infliction of emotional distress). Thus, the apparent reason that those courts have refused, correctly, to allow the plaintiffs to pursue their claims as state law tort claims is tied to preemption issues involving labor matters.

In the present case, however, the plaintiffs do not claim that they are alleging state law tort claims, but rather, have asserted an independent statutory right afforded to them by Congress under the ADEA: the right to be free from arbitrary discrimination in the workplace on the basis of their age. As a result, the preemption concerns that drove the artful pleading doctrine in the cases above are absent in this case.

Moreover, this distinction is significant, as was noted by the *Leu* court in a footnote. *See Leu,* 820 F.2d at 830 n. 9 (referring to *Atchison, T. & S.F. Ry. v. Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987). Although the *Buell* case presented a "very different question" from the issue in *Leu, Buell* is directly relevant to the case at bar, notwithstanding the fact that it was not cited in any of the parties' briefs.

In *Buell,* the carrier argued that the plaintiff's Federal Employers' Liability Act ("FELA") claim for damages arising from the defendants' alleged negligence was beyond a federal court's subject matter jurisdiction because it was a minor dispute that was subject to the exclusive jurisdiction of the NRAB. *See Buell,* 480 U.S. at 558–563,

107 S.Ct. at 1411–1414. The district court agreed and granted the carrier's motion for summary judgment. The Ninth Circuit reversed and the Supreme Court affirmed that portion of the appeals court's decision. *Id.* at 567, 107 S.Ct. at 1416. In so holding, the Supreme Court expressly stated several principles that are directly relevant to the case at bar.

> [T]he Railroad argues that an FELA action for damages is barred. We find no merit in this argument. The fact that an injury otherwise compensable under the FELA was caused by conduct that may have been subject to arbitration under the RLA *does not deprive an employee of his opportunity to bring an FELA action for damages.* ... [W]e have never considered that possibility a bar to an employee's bringing an FELA claim for personal injuries ... *This Court has, on numerous occasions, declined to hold that individual employees are, because of the availability of arbitration, barred from bringing claims under federal statutes.* See, e.g., *McDonald v. West Branch,* 466 U.S. 284 [104 S.Ct. 1799, 80 L.Ed.2d 302] (1984); *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728 [101 S.Ct. 1437, 67 L.Ed.2d 641] (1981); *Alexander v. Gardner–Denver,* 415 U.S. 36 [94 S.Ct. 1011, 39 L.Ed.2d 147] (1974). Although the analysis of the question under each statute is quite distinct, the theory running through these cases is that notwithstanding the strong policies encouraging arbitration, 'different considerations apply where the employee's claim is based on rights *arising out of a statute designed to provide minimum substantive guarantees to individual workers.'* *Barrentine,* 450 U.S. at 737 [101 S.Ct. at 1443].

*Buell,* 480 U.S. at 564–65, 107 S.Ct. at 1415 (emphases added). The Court went on to state that "absent an intolerable conflict between the two statutes, we are unwilling to read the RLA as repealing any part of the FELA." *Id.* at 566–67, 107 S.Ct. at 1416. For the reasons set forth in *Buell,* which are directly analogous to the case at bar, the Court finds that permitting the plaintiffs to proceed with their ADEA claims would not

"wreak havoc with the general scheme of RLA arbitration," *id.* at 566, 107 S.Ct. at 1416, and therefore the RLA does not divest this Court of jurisdiction over the plaintiffs' ADEA claims. Therefore, the motion to dismiss pursuant to Rule 12(b)(1) is denied.[7]

Given this Court's conclusion that this action is properly within its subject matter jurisdiction, it is now appropriate to address the merits of the claims asserted. This analysis must necessarily begin with a review of the applicable statutory scheme.

B. *The Governing Statutory Framework*

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

(a) [i]t shall be an unlawful employment practice for an employer—

(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a)(1) (1988); *see also St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). The ADEA, which was enacted subsequent to Title VII, prohibits discrimination on the basis of age. The prohibitory language of the ADEA, which was modelled after the language of Title VII, provides in relevant part:

(a) [i]t shall be unlawful for an employer—

(1) . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1) (1988); *see also Public Employees Retirement System of Ohio v.*

*Betts,* 492 U.S. 158, 165, 109 S.Ct. 2854, 2860, 106 L.Ed.2d 134 (1989).

The Supreme Court has fashioned two separate models whereby an aggrieved individual may seek to redress a claim of discrimination, the disparate treatment and the disparate impact models. The Supreme Court succinctly summarized the differences between these two theories of discrimination in an oft-cited footnote in *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), stating:

'[d]isparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical . . .

Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.' The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another . . . Proof of discriminatory motive, we have held, is not required under a disparate-impact theory.

*Id.* at 335–36 n. 15, 97 S.Ct. at 1854 n. 15 (citations omitted), *quoted with approval in Hazen Paper Company v. Biggins,* —— U.S. ——, —— – ——, 113 S.Ct. 1701, 1705–06, 123 L.Ed.2d 338 (1993).

■ These models share a common attribute in that they both permit a plaintiff, who alleges that he or she was the victim of some form of discrimination, to avail himself or herself of a presumption of discrimination in the absence of any direct evidence of discrimination. *See Texas Dep't of Community Af-*

---

**7.** To the extent that any of the defendants base their motion to dismiss for lack of subject matter jurisdiction on § 3(g) of Public Law 102–29, that reliance is misplaced.

Section 3(g) provides that "[t]here shall be no judicial review of any report or determination of the Special Board under this section." This section thus provides that the findings of the Special Board are not amenable to judicial review.

While it is true that the plaintiffs seek to challenge the mandatory promotion issue, an issue which certainly was before the Special Board,

the plaintiffs are not seeking judicial review of the Special Board's findings. Rather, they are asserting an independent statutory right under the ADEA that happens to be based on the same conduct and facts that form the basis for part of the Special Board's findings. Section 3(g) does not purport to restrict this Court's jurisdiction over a case that is otherwise properly within this Court's federal question jurisdiction under 28 U.S.C. § 1331. Therefore, this aspect of the defendants' motion to dismiss under Rule 12(b)(1) must also be denied, to the extent that it was asserted.

*fairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1980) (noting that if a plaintiff in a discrimination case can establish a prima facie case of discrimination, then the individual has "in effect create[d] a presumption that the employer unlawfully discriminated against the employee."). The proof that is necessary to avail oneself of this presumption, however, depends upon which theory of discrimination is being asserted.

### 1. *The Models of Discrimination*

#### a. *Disparate Treatment*

■ In a case predicated on the disparate treatment theory, the plaintiff will often rely on anecdotal evidence in order to show that when "compared with other like-qualified applicants, [he or she] was treated differently *because of* his [protected trait]." *Drake v. City of Fort Collins,* 927 F.2d 1156, 1160 (10th Cir.1991) (emphasis added); *see also Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1424 (10th Cir.1993) (citations omitted). Disparate treatment claims, therefore, are in essence claims of intentional discrimination on the basis of an individual's protected trait or status.

#### i. *The Applicable Case Law Interpretations*

■ In general, the burden of establishing a prima facie case of intentional discrimination, in the absence of any direct evidence of discrimination, is "not onerous[.]" *Bur-*

*dine,* 450 U.S. at 253, 101 S.Ct. at 1093. It simply requires the plaintiff to establish that he is a member of a protected class; that he was qualified for a particular job; that he was rejected for that job despite his qualifications; and that the employer continued to seek applications for that position from other persons with the plaintiff's qualifications. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1416–17 (10th Cir. 1993); *Drake,* 927 F.2d at 1159.

■ The *sina qua non* of a claim of intentional discrimination is proof that the defendant acted with a discriminatory motive or intent. *See Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988) (plurality opinion); *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094; *Martin,* 3 F.3d at 1417. Thus, a claim of disparate treatment is a claim of intentional discrimination which requires the plaintiff to establish that the employer had a discriminatory animus against the employee because the employee was a member of a class protected under Title VII, and that this animus was a motivating factor for the adverse employment action taken against the employee. *See United States Postal Bd. of Governors v. Aikens,* 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983), *quoted in E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1317 (10th Cir.1992).[8]

---

8. If and when the plaintiff establishes a prima facie case of unlawful discrimination, this creates a presumption of unlawful discrimination which, in the absence of any countervailing evidence, would be legally sufficient to permit the trier of fact to conclude that the defendant did in fact impermissibly discriminate against the plaintiff. *See Hicks,* —— U.S. at ——, —— —— —— n. 3, 113 S.Ct. at 2747 & 2748–49 n. 3.

In most cases, however, the defendant will offer evidence in an effort to rebut the presumption created by the plaintiff's prima facie case because of the obvious consequences of its failure to do so. *See id.* —— U.S. at —— – —— n. 3, 113 S.Ct. at 2748–49 n. 3. In order to rebut the presumption that its actions were discriminatory, the defendant bears the burden of producing evidence that its actions were taken for a legitimate, non-discriminatory reason. *See id.* —— U.S. at ——, 113 S.Ct. at 2747; *Martin,* 3 F.3d at 1417. *Hicks* reaffirmed the position that the defendant's burden is only a burden of produc-

tion because the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff[.]" *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, *quoted in Hicks,* —— U.S. at ——, 113 S.Ct. at 2747; *Faulkner,* 3 F.3d at 1425. *See generally Director, Office of Workers' Compensation, Dep't of Labor v. Greenwich Collieries,* —— U.S. ——, —— ——, 114 S.Ct. 2251, 2254–2257, 129 L.Ed.2d 221 (1994) (discussing the differences between burdens of production and burdens of persuasion).

Once the defendant produces a non-discriminatory reason for its actions, then "[t]he presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749. At that time, the plaintiff will have the opportunity to attempt to show that the defendant's proffered reason or reasons are untrue and that they are merely a pretext for discrimination. *See Burdine,* 450

■ Although the aforementioned cases all involved interpretations of Title VII, the Supreme Court has unequivocally held that the language of the ADEA expressly encompasses disparate treatment claims. *See Biggins,* — U.S. at —, 113 S.Ct. at 1706 (noting that the ADEA prohibits discrimination "because of" an individual's age); *id.* (noting that disparate treatment claims "capture[ ] the essence of what Congress sought to prohibit in the ADEA"). It is therefore unexceptional that disparate treatment claims may be asserted under the ADEA. *Id.* This conclusion is due, at least in part, to the fact that the prohibition in the ADEA against discrimination "because of" an individual's age was taken *in haec verba* from the language in Title VII prohibiting discrimination "because of" an individual's race, color, religion, sex or national origin. *See Oscar Meyer & Co. v. Evans,* 441 U.S. 750, 755, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979); *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978) (footnote omitted).

Moreover, this view is entirely consistent with the position adopted by the Tenth Circuit, which has held that "[t]he framework for assessing evidence in an age discrimination case parallels that applicable in a Title VII case." *Spulak v. K Mart Corp.,* 894 F.2d 1150, 1153 (10th Cir.1990) (disparate treatment claim under the ADEA); *see also E.E.O.C. v. Sperry Corp.,* 852 F.2d 503, 507 (10th Cir.1988) ("Courts regularly adapt the framework developed in Title VII cases ... to individual disparate treatment claims under ADEA") (citation omitted); *Merrick v. Northern Natural Gas Co.,* 911 F.2d 426, 429 (10th Cir.1990); *see also Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 529 (10th Cir.1994); *Faulkner,* 3 F.3d at 1424; *id.* at n. 2 (citing *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1119 (10th Cir.1991); *Denison v. Swaco Geolograph Co.,* 941 F.2d 1416, 1420 (10th Cir. 1991)). As a result, there can be no doubt that a disparate treatment claim is in fact cognizable under the ADEA. The question before the Court in this case thus becomes one of determining whether this claim may be maintained under the facts of this case.

### ii. *Application to the Case at Bar*

■ The defendants make two arguments in support of their motion for summary judgment: (1) the plaintiffs have failed to establish a prima facie case of intentional discrimination on the basis of age;[9] and (2) the plaintiffs have failed to carry their burden of establishing that there is a genuine issue of material fact with respect to whether their proffered non-discriminatory reasons were pretextual.

■ The validity *vel non* of the defendants' argument that the plaintiffs have failed to establish a prima facie case of intentional discrimination is irrelevant. It is well-settled that the *McDonnell Douglas* and

U.S. at 253, 255 n. 10, 101 S.Ct. at 1093, 1095 n. 10; *Watson,* 487 U.S. at 986, 108 S.Ct. at 2784. As the Tenth Circuit recently noted, the plaintiff must demonstrate that the defendant's reasons are:

> a pretext for *discrimination against a protected class.* A pretextual reason may be advanced to conceal a wide range of possible motivations, but Title VII only reaches pretextual cases where the advanced reason is shown to be a pretext for a discriminatory animus based upon a person's protected status.

*Flasher,* 986 F.2d at 1321 (citation omitted).

Once the plaintiff's rebuttal evidence has been introduced, the finder of fact will have all of the evidence before it which is necessary to decide the ultimate question of whether the defendant intentionally discriminated against the plaintiff "because of" his or her protected status. *See Hicks,* — U.S. at —, 113 S.Ct. at 2749.

**9.** As noted above, a plaintiff may avail himself of a presumption of discrimination by establishing a prima facie case of intentional discrimination. In order to establish this presumption, the plaintiff must show: (1) that he is within the protected age group (that he is over 40 years old); (2) that he was qualified for a particular position with the defendant; (3) that he was adversely affected by some decision or action of the defendant; and (4) that the defendant ultimately hired a person younger than the plaintiff. *See, e.g., Faulkner,* 3 F.3d at 1425 n. 3; *accord St. Mary's Honor Center,* — U.S. at —, 113 S.Ct. at 2747 (Title VII case).

In this case, the defendants argue that the plaintiffs were not qualified to serve as conductors when they were brakemen because they had not successfully passed an examination which was a necessary prerequisite to becoming a conductor. For reasons stated below, however, the Court need not resolve this issue since it is irrelevant.

*Burdine* burdens of proof are nothing more than "a means of arranging the presentation of evidence" in discrimination suits, *see Hicks,* —— U.S. at —— n. 3, 113 S.Ct. at 2749 n. 3 (citing *Watson,* 487 U.S. at 986, 108 S.Ct. at 2784), and that as such, they should not "be applied rigidly." *Cone,* 14 F.3d at 530 (citations omitted). Rather, the burdens of proof must be viewed with an understanding of their purpose, which is nothing more than a framework for the orderly presentation of proof in an employment discrimination lawsuit. *See Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. at 1094 n. 8 (stating that the aim of the burdens of proof is to "sharpen[ ] the inquiry into the elusive factual question of intentional discrimination."); *see also Hicks,* —— U.S. at ——, 113 S.Ct. at 2746 (stating that the burdens of proof were designed to establish "an order for the presentation of proof in ... discriminatory treatment cases.") (footnote omitted).

 It follows from this that if the defendant has come forward and produced evidence of a legitimate, non-discriminatory reason for its actions, then "the *McDonnell Douglas* framework—with its presumptions and burdens—*is no longer relevant.*" *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749 (emphasis added). Once the defendant meets its burden of production, then the presumption of discrimination created by the plaintiff's prima facie case "ha[s] fulfilled its role of forcing the defendant to come forward with some response" and accordingly, it "simply drops out of the picture." [10] *Id.* After the defendant has asserted its reasons, then the plaintiff is entitled to an opportunity to show that those reasons are in fact a pretext for dis-

crimination regardless of whether he may have established a prima facie case in the first instance. *See Cone,* 14 F.3d at 530.

 It is undisputed in this case that the defendant has in fact proffered a legitimate, non-discriminatory reason for its actions, namely, compliance with a congressional mandate. As a result, the question of whether the plaintiffs have established a prima facie case is no longer relevant in this case; the real issue is whether the plaintiff has shown that there is "enough evidence to support an inference that the employer's reason was merely a pretext[.]" *Id.* The plaintiff bears the burden of proving more than just that the asserted reasons were pretextual; those reasons must be a pretext *for unlawful discrimination against a member of a protected class. See Flasher,* 986 F.2d at 1321 (emphasis added).

"To defeat a summary judgment motion, [the plaintiff] would have to simply point to *evidence* establishing a reasonable inference that the employer's proffered explanation is unworthy of credence." *Id.* (citing *MacDonald,* 941 F.2d at 1121–22 (emphasis added). The emphasis on the word "evidence" reinforces the fact that if the non-moving party fails to demonstrate that there is evidence that creates a genuine issue of material fact on an "element essential to that party's case, and on which that party will bear the burden of proof at trial," then summary judgment is appropriate. *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *see also O'Driscoll v. Hercules, Inc.,* 12 F.3d 176, 179 (10th Cir.1994). "[A]llegations alone will not defeat summary judgment." *Cone,* 14 F.3d

---

**10.** While it is true that *Hicks* was a case involving review of the trial court's findings of fact and conclusions of law after a bench trial, whereas this case involves a motion for summary judgment, there is no valid reason for confining this portion of *Hicks* to cases at the summary judgment phase. Moreover, the Tenth Circuit has seemingly endorsed this view, albeit in an unpublished order and judgment. *See Card v. Hercules, Inc.,* No. 92–4169, 1993 WL 351337, *2, 1993 U.S.App. LEXIS 21631, *5 (10th Cir. Aug. 19, 1993).

While the Court is cognizant that citation to unpublished orders and judgments is "not favored," a standing order of the Tenth Circuit permits citation of these decisions when they

have "persuasive value with respect to a material issue in a case and would assist the court in its disposition[.]" *See In re Citation of Unpublished Opinions/Orders and Judgments,* 151 F.R.D. 470 (10th Cir.1993) (*en banc*). Because of the relative recency of the *Hicks* decision, and the corresponding lack of published decisions in this circuit interpreting the parameters of that case, the Court finds that reliance on *Card* is useful for its persuasive value on the issue of whether the reasoning of *Hicks* applies to a motion for summary judgment. As a result, the Court finds that whether the plaintiffs have established a prima facie case is irrelevant since the defendant has come forward and offered non-discriminatory reasons for its actions.

at 530 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552); *see also* FED.R.CIV.P. 56(e) (noting that a party may not defeat an otherwise properly supported motion for summary judgment by "rest[ing] upon the mere allegations [in their pleadings] ... but [they] must set forth specific facts showing that there is a genuine issue for trial."); *Denhardt,* 836 F.Supp. at 798 ("The non-moving party is now put to their proof.").

■ After a careful review of the record, the Court finds that the plaintiffs have failed to offer any evidence that would permit a rational trier of fact to conclude that the defendants' actions were a pretext for intentional and unlawful discrimination on the basis of age. In opposing the defendants' motion for summary judgment, the plaintiffs have filed numerous affidavits pursuant to Rule 56(e). Aside from being conclusory and duplicative,[11] the affidavits do not contain any facts which would permit a reasonable trier of fact to find that the defendants' actions were motivated by a discriminatory animus with respect to the plaintiffs' ages.[12] The fact that the affidavits state that "[t]he railroad and the UTU knew that without some further provision in the agreement it would have a disparate impact on Brakemen over 40 years of age" does not change the conclusion that there is no evidence of *intentional* discrimination necessary to support a disparate treatment claim. Moreover, not only do the affidavits not contain any factual basis for the assertion that the defendants impermissibly acted on the basis of the plaintiffs' age, they do not contain any allegations that would even support an inference of intentional discrimination. Additionally, the conclusory allegations in the complaints filed in these cases cannot be relied on to defeat the defendants' motions for summary judgment.

■ Even viewing the evidence in the light most favorable to the plaintiffs, the Court finds that there is an absence of any credible evidence to rebut the defendants'

proffered reason for its employment actions. As the Eleventh Circuit stated:

> [a] plaintiff when faced with a motion for summary judgment cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to ... respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact. Even where a prima facie case has been established but the defendant has rebutted with a proffer of a legitimate, non-discriminatory reasons for the discharge, *a genuine issue of material fact is not automatically created.*

*Pace v. Southern Ry. Sys.,* 701 F.2d 1383, 1391 (11th Cir.) (emphasis added), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983), *quoted in Matson v. Cargill, Inc.,* 618 F.Supp. 278, 281 (D.Minn. 1985). The *Matson* court then stated that "if the plaintiff cannot produce sufficient evidence to create an inference of discriminatory motive, then the employer's articulated business reasons remain unrebutted, and summary judgment is appropriate." *Matson,* 618 F.Supp. at 281–82 (citing *Steckl v. Motorola, Inc.,* 703 F.2d 392 (9th Cir.1983)).

Based on the plaintiffs' failure to carry their burden of showing that the defendants' actions were a pretext for intentional discrimination, summary judgment is warranted on the disparate treatment claim. *See, e.g., Branson v. Price River Coal Co.,* 853 F.2d 768, 771 (10th Cir.1988) (affirming district court's grant of summary judgment "on the grounds that plaintiffs failed to present any credible evidence on the issue of pretext" and finding that their subjective "mere conjecture" was insufficient); *accord MacDonald,* 941 F.2d at 1118.

Having resolved the plaintiffs' disparate treatment claim, the Court will now consider the defendants' motion with respect to the plaintiffs' disparate impact claim.

---

**11.** Nearly all of the forty or so affidavits submitted contain the exact same "boilerplate" language. The only difference is that each one is signed by a different affiant.

**12.** "[Discriminatory] intent means doing something because of, not in spite of, a particular

consequence." *Metz v. Transit Mix, Inc.,* 828 F.2d 1202, 1216 (7th Cir.1987) (Easterbrook, J., dissenting) (citing *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)).

### b. *The Disparate Impact Model*

While it is clear that disparate treatment involves "the most easily understood type of discrimination," *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, *quoted in Watson*, 487 U.S. at 986, 108 S.Ct. at 2784, the Supreme Court's landmark decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) recognized a second, alternative theory of discrimination, the so-called disparate impact model. The Court stated that it was necessary to allow a claim premised on the disparate impact theory in order to further the congressional purposes behind Title VII of "achiev[ing] equality of employment opportunities" and removing the kind of "artificial, arbitrary, and unnecessary barriers to employment" and stereotypes that operated in the past to disadvantage particular groups of individuals. *Id.* at 429–31, 91 S.Ct. at 852–54.

■■■■■ A disparate impact claim alleges that an otherwise facially neutral, non-discriminatory employment practice nonetheless has significant adverse effects on protected groups, even in the absence of any proof that the employer adopted the practice with a discriminatory motive or intent. *Id.* 487 U.S. at 986–87, 108 S.Ct. at 2784–85; *see also Faulkner*, 3 F.3d at 1428; *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1243 (10th Cir. 1991). "To establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989),[13] *quoted in Faulkner*, 3 F.3d at 1428; *see also Murphy v. Derwinski*, 990 F.2d 540, 544 (10th Cir.1993).[14]

### i. *Title VII*

■■■■ "[T]he necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson*, 487 U.S. at 987, 108 S.Ct. at 2785, *quoted in Faulkner*, 3 F.3d at 1428. Unlike the disparate treatment model, which challenges particular adverse employment

---

13. While portions of the *Wards Cove Packing* decision dealing with the burdens of proof in a disparate impact case were expressly overturned by Congress in the 1991 amendments to the Civil Rights Act, *see* 42 U.S.C. § 2000e–2(k)(1)(A) (West Supp.1994), that case is still valid authority for its recitation of the elements of a disparate impact claim.

14. If the plaintiffs' evidence establishes a prima facie case of disparate impact discrimination, then under the law as set forth in the *Wards Cove Packing* decision, "the employer carries the burden producing evidence of a business justification for his employment practice. *The burden of persuasion, however, remains with the disparate-impact plaintiff.*" *Wards Cove Packing*, 490 U.S. at 659, 109 S.Ct. at 2126 (emphasis added). This holding is entirely consistent with the Supreme Court's decisions interpreting the burdens of proof in disparate treatment cases. *E.g., St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2749. Indeed, Justice White's opinion in *Wards Cove Packing* relied on *Watson*, a disparate treatment case, in support of the quotation above. *See id.*

In its legislative response to *Wards Cove Packing*, however, Congress expressly rejected the italicized language above and reallocated the burden of persuasion with respect to the business justification defense in a disparate impact case to the defendant. *See* 42 U.S.C. § 2000e–2(k)(1)(A)(i). Under that statute, the defendant bears the burden of proving that the employment practice "is job related for the position in question and consistent with business necessity[.]" *See* 42 U.S.C. § 2000e–2(k)(1)(A); *see also Wards Cove Packing*, 490 U.S. at 658, 109 S.Ct. at 2125; *Watson*, 487 U.S. at 998, 108 S.Ct. at 2790; *Faulkner*, 3 F.3d at 1428–30.

The view that Congress changed this aspect of the burdens of proof set out in *Wards Cove Packing* was the one espoused by the Ninth Circuit in its subsequent *Wards Cove Packing* opinion on remand from the Supreme Court. *See Atonio v. Wards Cove Packing Co.*, 10 F.3d 1485, 1491 (9th Cir.1993) (stating that the 1991 amendments "place[ ] on the employer the burden of proving that a practice causing a disparate impact is job related for the position in question and consistent with business necessity") (internal quotations omitted).

Finally, analogous to disparate treatment cases, once the defendant offers evidence in support of its defense, the plaintiff is entitled to an opportunity to prove a pretext by the employer by "persuad[ing] the factfinder that 'other tests or selection devices, without a similarly undesirable [effect on the protected class] would also serve the employer's legitimate [hiring] interest[s].'" *Moody*, 422 U.S. at 425, 95 S.Ct. at 2375, *quoted in Faulkner*, 3 F.3d at 1429 (footnote omitted).

*actions,* the disparate impact approach permits an employee to challenge particular employment *practices* which, although facially neutral, have the practical effect [15] of disproportionately bearing on members of a protected class. *See Watson,* 487 U.S. at 987–88, 108 S.Ct. at 2784–86.

The method of proof employed for establishing a presumption of discrimination in disparate impact cases "usually focuses on statistical disparities, rather than specific incidents [of misconduct.]" *Watson,* 487 U.S. at 987, 108 S.Ct. at 2785. Examples of employment practices that, in certain instances, have been held to have a disparate impact include standardized employment tests such as written aptitude tests, *see Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (disparate impact based on race), written tests of verbal skills, *see Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (same) and height and weight requirements, *see Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (disparate impact based on gender).

In order to understand fully the issue of whether the disparate impact theory of discrimination enunciated in *Griggs* should be incorporated into the ADEA, it is useful to review the historical basis behind the *Griggs* decision and the disparate impact theory.

After Title VII took effect in July of 1965, it was clear that overt discrimination on the basis of the protected traits embodied in that statute was prohibited.[16] In *Griggs,* the Court unanimously recognized that if Title VII was interpreted to prohibit only overt intentional discrimination, then employers could effectively circumvent this prohibition through the back door by enacting facially non-discriminatory measures that had the practical effect of discriminating against the same groups of individuals. In the Supreme Court's words, employers would be free to enact facially neutral "practices, procedures,

or tests" in an effort to " 'freeze' the status quo of prior discriminatory employment practices." *Id.* 401 U.S. at 430, 91 S.Ct. at 853. Thus, these purportedly neutral practices would have the functional effect of perpetuating the history of societal discrimination against these groups of individuals. Specifically, the Court found a nexus between the history of societal discrimination and the lower test scores registered by African–Americans. *See id.* at 430, 91 S.Ct. at 853 (stating that the lower test scores "would appear to be directly traceable to race.").

For example, the practice that was condemned in *Griggs* was a requirement that employees successfully pass two different aptitude tests and possess an high school diploma before they could be eligible for intercompany transfers. *Id.* at 427–29, 91 S.Ct. at 851–53. The Court struck down the employment practice on the ground that those requirements would tend to perpetuate the history of past discrimination against African–Americans, and thus freeze the existing discriminatory composition of the defendants' work force. The *Griggs* Court cited *Gaston County v. United States,* 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969) in support of the unfortunate, but well-known, fact that Negroes "have long received inferior education in segregated schools[.]" *Griggs,* 401 U.S. at 430, 91 S.Ct. at 853. Two years later, in *McDonnell Douglas,* Justice Powell, writing for the Court, reiterated that:

> *Griggs* was rightly concerned that childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives.

*McDonnell Douglas,* 411 U.S. at 806, 93 S.Ct. at 1826. Viewed in context, then, it is clear that *Griggs'* adoption of the disparate impact theory was grounded in the fear of allowing employers' work forces to remain stagnant

---

**15.** As Judge Easterbrook noted, a more accurate description of this model would use the phrase "disparate effect" rather than "disparate impact." Nonetheless, the latter is used since it is the established convention. *See Metz,* 828 F.2d at 1214 (Easterbrook, J., dissenting).

**16.** Prior to the enactment of Title VII, employers openly discriminated against individuals based on negative stereotypes regarding, *inter alia,* gender and race. *See Griggs,* 401 U.S. at 427–28, 91 S.Ct. at 851–52 (noting the history of overt discrimination by Duke Power prior to 1965).

and discriminatory in composition with respect to certain groups of individuals when that group of individuals has been subjected to an empirically documented history of overt societal discrimination based on factors beyond their control. In order to prevent employers from circumventing the broadly phrased congressional prohibition contained in Title VII, the *Griggs* Court adopted the disparate impact theory.

It is with this understanding of the under-. pinnings of the disparate impact doctrine that this Court must now decide the question of whether, in the words of Justice Stevens, it is "[ ]appropriate simply to transplant [Title VII] standards in their entirety into a different statutory scheme having a different history." *Davis,* 426 U.S. at 255, 96 S.Ct. at 2054 (Stevens, J., concurring).

### ii. *The ADEA*

Neither the Supreme Court, *see Biggins,* —— U.S. at —— 113 S.Ct. at 1706 (citing *Markham v. Geller,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981) (Rehnquist, J., dissenting from the denial of certiorari)); *id.* —— U.S. at ——, 113 S.Ct. at 1710 (Kennedy, J., concurring), nor the Tenth Circuit, *see Faulkner,* 3 F.3d at 1428 (assuming the applicability of disparate impact under the ADEA without deciding the issue) (citations omitted), has ever held[17] that the disparate impact theory of discrimination is cognizable under the ADEA. Moreover, all of the other federal circuit courts of appeals that have

considered this issue have either assumed that the disparate impact doctrine applies under the ADEA, or have concluded that it applies without any formal analysis of the issue. *See, e.g., Fisher v. Transco Services–Milwaukee, Inc.,* 979 F.2d 1239, 1244–45 & n. 3 (7th Cir.1992) (noting that prior Seventh Circuit precedent has only "assumed" that disparate impact is available under the ADEA); *E.E.O.C. v. Westinghouse Elec. Corp.,* 925 F.2d 619, 627 (3d Cir.1991); *MacPherson v. University of Montevallo,* 922 F.2d 766, 770–71 (11th Cir.1991); *Abbott v. Federal Forge, Inc.,* 912 F.2d 867 (6th Cir. 1990); *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420–21 (9th Cir.1990); *Leftwich v. Harris–Stowe State College,* 702 F.2d 686, 690–91 (8th Cir.1983); *Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981).[18] *But see Martincic v. Urban Redevelopment Auth.,* 844 F.Supp. 1073, 1076–78 (W.D.Pa.1994) (concluding that the disparate impact theory was unavailable under the ADEA).

It is thus apparent that this case squarely presents this Court with a significant issue of first impression within this circuit on the question of whether it is proper to apply the disparate impact theory of discrimination to age discrimination cases. At a minimum, this formidable task requires this Court to give this issue an appropriate level of attention and scrutiny. As one court stated, "[t]hat the [ADEA] is embodied in a separate

---

**17.** To be sure, in *Heward v. Western Elec. Co., Inc.,* 35 Fair Empl.Prac.Cas. (BNA) 807 (10th Cir.1984), the Tenth Circuit did "recogni[ze] that a plaintiff may bring a cause of action under the ADEA under either the disparate treatment or the disparate impact theory of recovery." In support of this proposition, the court cited *McDonnell Douglas* and *Griggs,* both of which were Title VII cases, along with its earlier decision in *Schwager v. Sun Oil Co. of Pennsylvania,* 591 F.2d 58 (10th Cir.1979), an ADEA disparate treatment case.

There are, however, at least two reasons why *Heward* cannot be considered as an authoritative precedent on this question of law. First, in footnote five, which immediately follows the sentence quoted above, the court of appeals expressly stated that "[t]he record is replete with Heward's acknowledgements that his cause of action was based on disparate treatment analysis rather than disparate impact analysis." Thus,

the statement quoted above is, at best, classic obiter dicta. Second, one of the most recent decisions from the Tenth Circuit involving this issue expressly states that it has never been "directly addressed" in this circuit. *See Faulkner,* 3 F.3d at 1428. Thus, the Tenth Circuit itself apparently does not regard the *Heward* decision as authoritative. As a result, it is clear to this Court that this issue is one of first impression within this circuit.

**18.** In subsequent cases, the Second Circuit has adhered to its decision in *Geller,* which is generally credited as the first decision to declare the applicability of the disparate impact doctrine under the ADEA. *See, e.g., Maresco v. Evans Chemetics,* 964 F.2d 106, 115 (2d Cir.1992); *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 117 (2d Cir.1991); *Lowe v. Commack Union Free Sch. Dist.,* 886 F.2d 1364, 1369 (2d Cir.1989), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990).

act and has its own unique history at least counsel the examiner to consider the particular problems sought to be reached by the statute." *Laugesen v. Anaconda Co.,* 510 F.2d 307, 312 (6th Cir.1975). For reasons expounded on below, this Court concludes that it is inappropriate to incorporate the disparate impact theory of discrimination enumerated in *Griggs* into the ADEA, and as a result, the defendants' motion for summary judgment is warranted on this claim.

### 1. *Language of the ADEA*

The defendants' initial argument rests on a comparison of the language of Title VII and that of the ADEA. Many of these arguments were first set forth in an oft-cited law review note. *See* Note, *Age Discrimination and the Disparate Impact Doctrine,* 34 Stan. L.Rev. 837 (1982), *cited in, e.g., Biggins,* —— U.S. at ——, 113 S.Ct. at 1710 (Kennedy, J., concurring). This portion of the defendants' argument is premised on a literal reading of the statutory language of the ADEA, portions of which the Supreme Court has stated are similar to the language of Title VII. *See Evans,* 441 U.S. at 755, 99 S.Ct. at 2071; *Lorillard,* 434 U.S. at 584, 98 S.Ct. at 872 (footnote omitted).

There are two components to this argument. The first is whether disparate impact claims are cognizable under the ADEA. The second is whether such claims are in fact prohibited by the ADEA. As to the former, the defendants' argument rests on the "because of" language of the ADEA and asserts that this language only authorizes disparate treatment claims. It is apparent, however, that this argument does not hold water since Title VII, like the ADEA, only prohibits discrimination "because of" an individual's protected status, yet disparate impact claims are recognized under Title VII. Therefore, this argument cannot support the defendant's position.

The second aspect of this argument relies on pieces of statutory text which are found in the ADEA but which lack a parallel provision in Title VII. Section 623(f)(1) of the ADEA permits an employer to defend a claim of age discrimination on the grounds that any differential treatment was "based on reasonable factors other than age." 29 U.S.C. § 623(f)(1). Relying on this language, the defendants argue that the ADEA actually prohibits disparate impact claims since the alleged employment practice sought to be challenged would constitute a reasonable factor other than age. It is at least arguable, however, that the modifier "reasonable" could be interpreted within the scheme of a disparate impact claim as encapsulating the defenses of business necessity and job relatedness; that is, a factor other than age which nonetheless has a disparate impact based on age is a defense to such a claim if it is "reasonable" (i.e., is related to the position in question). Therefore, the Court is not persuaded by this argument. As a result, it will be necessary to look beyond the plain language of the statute. *Cf. Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981).

### 2. *The 1991 Amendments to the Civil Rights Act*

The defendants' second argument is that when Congress codified the principles of the disparate impact theory of discrimination in the 1991 amendments to Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e–2(k)(1)(A) (West Supp.1994), the failure to codify this principle under the ADEA constitutes an implied rejection of the doctrine's applicability under the ADEA.[19] The defendants' bolster their argument by noting that

---

**19.** In codifying the disparate impact theory, it is clear that Congress intended to overrule expressly the portion of the Supreme Court's decision in *Wards Cove Packing* which dealt with the burdens of production and persuasion in a disparate impact case. *See* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071.

Section 2(2) of the "Findings" section of that law states that "the decision of the Supreme Court in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) has weakened the scope and effectiveness of Fed-

eral civil rights protections[.]" Section 3(2) of the "Purposes" section of that law states that the amendments were intended "to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in ... decisions prior to *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)[.]" Thus, it is readily apparent that the *Wards Cove Packing* decision, a Title VII case, was one of the primary purposes motivating Congress to enact the 1991 amendments to the Civil Rights Act of 1964.

Congress did in fact amend certain portions of the ADEA as part of the 1991 amendments;[20] thus, they assert that Congress' failure to include the codification of the disparate impact theory under the ADEA was a conscious omission which supports their position that the disparate impact theory is inapplicable to claims under the ADEA.

While this reasoning arguably has some appeal, the Supreme Court has repeatedly cautioned the lower courts as to the dangers inherent in attempting to infer some affirmative intention from congressional silence or inaction. *E.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306, 108 S.Ct. 1145, 1153, 99 L.Ed.2d 316 (1988), *citing Red Lion Broadcasting Co. v. Federal Communications Comm'n*, 395 U.S. 367, 381 n. 11, 89 S.Ct. 1794, 1802 n. 11, 23 L.Ed.2d 371 (1969); *American Trucking Ass'ns, Inc. v. Atchison, T. & S.F. Ry. Co.*, 387 U.S. 397, 416–18, 87 S.Ct. 1608, 1618–20, 18 L.Ed.2d 847 (1967).

This admonition, however, is not an absolute prohibition against the use of congressional inaction. At least one federal district court has relied, in part, on this principle in support of its conclusion that the disparate impact theory is unavailable to claims brought under the ADEA. *See Martincic*, 844 F.Supp. at 1076–78.[21] With all due respect to that court, this Court believes that a more prudent approach would refrain from attempting to draw an inference from inaction. This Court is wary of undertaking the task of imputing action to a co-equal branch of government from the latter's inaction.

There are, moreover, various reasons why Congress may not have codified the disparate impact theory under the ADEA, not the least of which is that it may have been more concerned with overturning the Supreme Court's existing Title VII jurisprudence.[22] More specifically, with respect to disparate impact claims, Congress may have been preoccupied with overturning the *Wards Cove Packing* decision, a Title VII case, and not the particular arguments for and against extending the disparate impact doctrine to age discrimination claims under the ADEA. In short, Congress simply may not have given adequate consideration to the issue of whether the disparate impact doctrine should be extended to the ADEA. For this reason alone, this Court believes that little, if any, weight should be attributed to congressional inaction in this context.

### 3. The Policies Behind the Griggs Decision

The defendants' third and final basis for asserting that the disparate impact theory is inapplicable under the ADEA goes to the issue of whether the purposes and policies that underlie the *Griggs* decision are germane and applicable to a claim under the ADEA. For reasons given below, the Court finds that they are not.

It is accurate to say that "[t]he concept of perpetuating past discrimination [was] central to the *Griggs* rationale." *See* Note, 34 Stan.L.Rev. at 848. Although *Griggs* was a Title VII case involving racial discrimination, the Supreme Court relied on that decision and its decision in *Moody*, another race dis-

---

**20.** *See* 29 U.S.C. § 626(e)–(f) (West Supp.1994).

**21.** In the words of the *Martincic* court:
Congress' recent decision to include disparate impact in Title VII claims based on race, color, religion, sex, and national origin, but not to suggest disparate impact analysis for age in the ADEA, or elsewhere, *was not an oversight.*
*Martincic*, 844 F.Supp. at 1078 (emphasis added).

**22.** It is noteworthy that in section 3(4) of the "Purposes" behind the 1991 amendments to the Civil Rights Act, Congress stated its desire "to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination."

Thus, there can be little doubt that the overriding aim of the 1991 amendments to the Civil Rights Act of 1964 was a legislative response to the most recent Supreme Court decisions interpreting the civil rights laws. Significantly, most of the decisions which Congress chose to respond to were decided under Title VII and *not* the ADEA. *See, e.g., Wards Cove Packing*, 490 U.S. 642, 109 S.Ct. 2115; *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Watson*, 487 U.S. 977, 108 S.Ct. 2777; *cf. Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (interpreting 42 U.S.C. § 1981).

crimination case, in applying the disparate impact theory to a claim of gender discrimination. *See Dothard,* 433 U.S. at 329, 97 S.Ct. at 2726 (citing *Griggs,* 401 U.S. 424, 91 S.Ct. 849; *Moody,* 422 U.S. 405, 95 S.Ct. 2362, and noting that the reasoning employed in those cases "guide[s] our approach here."). The *Dothard* Court did not analyze the policies that buttressed the *Griggs* decision in implicitly approving of the availability of a disparate impact claim based on gender, and such claims are now generally accepted.[23] *E.g., Murphy,* 990 F.2d at 544.

The ADEA, however, protects against discrimination on the basis of age. While *Griggs* was rightly concerned with eliminating arbitrary barriers to employment on the basis of stereotypes that were not relevant to an individual's ability to perform a job, there is, at some level, a degree of correlation between age and ability. More importantly for present purposes, however, is the fact that this correlation cannot be traced to an history of past discrimination against these particular individuals who were previously younger and possibly the beneficiaries of any age discrimination. In *Griggs,* the critical fact was the link between the history of educational discrimination and the use of that discrimination as a means of presently disadvantaging African–Americans. These concerns simply are not present when the alleged disparate impact is based on age.

This conclusion is further reinforced by the fact that the Supreme Court itself has expressly declined to equate the degree of prior discrimination against older workers with the level of discrimination against African–Americans. In *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (*per curiam* ), the Supreme Court held that a Massachusetts statute establishing a mandatory retirement age of fifty for police officers did not amount to discrimination against a suspect class for purposes of the equal protection clause of the Fourteenth Amendment. As a result, the statute was only subjected to rational basis review and was thus upheld. *Id.* at 312, 96 S.Ct. at 2566. In so holding, the Court made several observations which are relevant to the case at bar.

> While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, *have not experienced a history of purposeful unequal treatment or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities.*

*Id.* at 313, 96 S.Ct. at 2567 (emphasis added). Thus, while recognizing that the level of discrimination against the elderly was not the same as that against African–Americans, the *Murgia* Court also recognized that age is often a relevant indicator of job performance and is not a completely inapposite stereotype with no correlation to job performance.

When these teachings are viewed in conjunction with the fact that an employer's current employment practices cannot be said to *perpetuate* past discrimination against a particular group of older workers—since age is a mutable characteristic—which was a central factor in *Griggs,* it is apparent that the underpinnings of *Griggs* simply have no application when the alleged discrimination is based on age. Phrased alternatively, an employment practice which disproportionately falls on older individuals, standing alone, should not be said to give rise to an inference or a presumption of unlawful discrimination on the basis of age. Accordingly, based on this Court's conclusion that the plaintiffs' disparate impact claims are not cognizable under the ADEA as a matter of law, the

---

23. Disparate impact claims based on national origin and religion appear in the reported cases. *See, e.g., Cota v. Tucson Police Dep't,* 783 F.Supp. 458, 471–74 (D.Ariz.1992) (national origin); *Tagatz v. Marquette Univ.,* 681 F.Supp. 1344, 1357– 59 (E.D.Wis.1988) (religion). *But cf. E.E.O.C. v. Sambo's of Georgia, Inc.,* 530 F.Supp. 86, 92–93 (N.D.Ga.1981) (finding that the disparate impact theory was unavailable to challenge a practice allegingly burdening individuals because of their religion based on the definition of religion contained in 42 U.S.C. § 2000e–2(j)). This Court was unable to find any reported decisions alleging discrimination on the basis of "color."

Nonetheless, it is clear that the primary traits for which disparate impact claims are asserted are race and gender.

defendants' motion for summary judgment is warranted.

**THEREFORE,** it is

**ORDERED** that the Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction be, and the same hereby are, **DE-NIED.** It is further

**ORDERED** that the Defendants' Motions for Summary Judgment be, and the same hereby are, **GRANTED.**