UNITED TRANSPORTATION
UNION, Appellant,

v.

UNITED STATES of America, et al.

BURLINGTON NORTHERN RAILROAD
COMPANY, et al.

v.

UNITED TRANSPORTATION
UNION, Appellant.

Nos. 92–5002, 92–5016.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 10, 1992.

Decided March 9, 1993.

Norton N. Newborn, with whom Clinton J. Miller, III, Gen. Counsel, U. Transp. Union, Joseph Guerrieri, Jr. and Mark Masling were on the brief, for appellant. John A. Edmond also entered an appearance for appellant.

Jeffrey A. Clair, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., William Kanter, Atty., Dept. of Justice, and Ronald M. Etters, Gen. Counsel, Nat. Mediation Bd., were on the brief, for appellee.

Peter Buscemi, Harry A. Rissetto and D. Michael Underhill, were on the brief for appellees, Burlington Northern R.R. Co., CSX Transp., Inc., Denver and Rio Grande Western R.R. Co., Ill. Cent. R.R. Co., Kansas City Southern Railway Co., Norfolk Southern Railway Co., Norfolk and Western Railway Co., St. Louis Southwestern Railway Co., Southern Pac. Transp. Co. and Union Pac. R.R. Co.

Ralph J. Moore, Jr. and John Townsend Rich were on the joint brief for appellee, Chicago & North Western Transp. Co.

Bruce R. Lerner, Susan D. Carle, and Harold A. Ross, Attys., were on the brief for appellee Broth. of Locomotive Engineers.

Before: MIKVA, Chief Judge, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The United Transportation Union (UTU) appeals the district court's rejection of its claims that Public Law 102–29 (the Act) violates the Commerce Clause and conflicts with the Railway Labor Act (RLA). The Act settled a labor dispute between UTU and most of the nation's Class I rail carriers by imposing a collective bargaining agreement which, *inter alia,* reopened negotiations over the makeup of railway crews (the crew consist issue) and authorized a rival union to be the exclusive representative of certain engineers previously represented by UTU. UTU contends that because existing collective bargaining agreements (called moratoriums) prevented it from striking directly over the crew consist issue, Congress' decision to permit the renegotiation of the crew consist arrangements lacked a rational constitutional basis. We think, however, that Congress recognized that the inability of either side to alter the crew consist arrangements may have contributed to the stalemate reached on the *remaining* labor issues. Congress' decision to reopen negotiations, therefore, was reasonably designed to resolve the labor dispute. UTU also argues that the Act's designation of a rival union as the exclusive representative of all engineers violates a provision of the RLA, and that UTU, rather than its rival, should represent certain engineers. This contention at least arguably raises a representation dispute subject to the National Mediation Board's (NMB) exclusive jurisdiction, and we accordingly dismiss the claim so that the NMB can exercise primary jurisdiction over it. The district court's decision is, therefore, affirmed.

I.

The labor dispute that led to this litigation began in July 1988, when the majority of UTU's local General Committees of Adjustment (the local unions) opened negotiations with the carriers by serving notice under section six of the RLA. 45 U.S.C. § 156. The unions sought to improve the wages and health care benefits of their

members—almost all of the firemen, conductors, brakemen, yardmen and yardmasters employed by the carriers. In October 1988, the individual carriers made counterproposals seeking sharp wage reductions. As an alternative, the carriers offered smaller wage cuts if the local unions would agree to reopen the crew consist arrangements, local-level agreements reached in the early 1980's by which a union and the carriers generally agreed to have one conductor and one or two brakemen on each train crew. The unions had the legal right to refuse to discuss these arrangements because local "moratorium" agreements prohibited either side from initiating a section six proceeding to alter the crew consist arrangements until a specified future date. The local unions refused to reopen the crew consist arrangements, and the labor dispute moved to its next stage, "national handling."

All of the carriers involved in this litigation designated the National Carriers' Conference Committee (NCCC) of the National Railway Labor Conference to negotiate on their behalf. UTU's National Negotiating Committee represented the local UTU General Committees in bargaining sessions with the NCCC which began in February 1989. UTU and the NCCC quickly reached an impasse in April 1989 and accordingly asked the NMB to mediate pursuant to 45 U.S.C. § 155. The NMB's year-long mediation efforts failed to resolve the stalemate, and in April 1990, the Board offered arbitration to include other unions involved in parallel labor negotiations with the NCCC. The unions and the NCCC declined the offer. The NMB then certified to President Bush that the labor dispute threatened a substantial disruption of interstate commerce. Based on the NMB's recommendation, the President, pursuant to his authority under 45 U.S.C. § 160, appointed Presidential Emergency Board (PEB) 219 to investigate the consolidated disputes between the carriers and the various unions, including UTU. Exec. Order No. 12714, 55 Fed.Reg. 19,047 (1990).

The PEB conducted extensive hearings and took testimony from all of the interested parties. The transcript of the proceedings runs to over 21,000 pages. The PEB issued its report and recommendations to President Bush on January 15, 1991. The unions voluntarily extended the 30–day period after the PEB report, in which strikes are forbidden, to 90 days to avoid any interference with the United States' efforts in the Persian Gulf War. Although three unions came to terms with the NCCC during this interim cooling off period, eight unions, including UTU, could not resolve their differences with the NCCC and went on strike at 7:00 a.m. on April 17, 1991.

Congress reacted quickly to the strike, passing legislation to resolve it in the early morning hours of April 18, 1991. President Bush signed the Act, Pub.L. No. 102–29, 105 Stat. 169, later that day. The Act imposed the final report of PEB 219, subject to revision by another Special Board appointed by the President, as the collective bargaining agreement to govern the parties. The Special Board entertained requests for clarification and modification of the final report, but on July 18, 1991, it denied all requests for modification, and the unaltered final report was imposed on the parties.

The final report resolved all of the ongoing labor disputes, including the impasse between UTU and the carriers. It provided for a wage increase, an improvement in some employee benefits, an extended work day, and the reopening of the crew consist arrangements. Although the PEB had acknowledged that the local crew consist arrangements fell outside its national jurisdiction, the final report authorized renegotiation of the arrangements because they were a source of tension between UTU and the carriers and the PEB thought that the overall labor dispute would not be resolved if this key variable remained fixed. Thus the final report allowed the parties to bring a section six motion to bargain locally over the terms of the crew consist arrangements, which was, of course, a direct abrogation of the moratorium agreements. If those negotiations were to founder, the

parties were obliged to accept mandatory binding arbitration.

The final report also recognized the Brotherhood of Locomotive Engineers (BLE) as the exclusive bargaining representative of engineers in on property grievance proceedings (these are minor grievance and disciplinary proceedings that are handled on the employer's premises). BLE is the certified class representative for engineers, but not all engineers belong to BLE. Many engineers who previously worked as yard personnel represented by UTU retain their UTU membership after promotion. As a consequence of this unusual arrangement, UTU had agreements with most of the carriers to permit it to represent its engineer members in on property grievance proceedings. The RLA sanctions this historical practice by directing that such disputes "be handled in the usual manner." 45 U.S.C. § 153 First(i). During the PEB proceedings, BLE proposed that it be authorized as the exclusive representative of all engineers in on property grievances. The final report, alluding to the peculiarity of the existing practice, adopted BLE's proposal.

Both UTU and the carriers filed actions that focused on the constitutionality of the Act's imposition of the final report as a collective bargaining agreement. UTU sought a declaratory judgment that the statute violated the Takings Clause and that the revision of the crew consist agreements exceeded Congress' Commerce Clause power. The carriers brought an opposing complaint against UTU asking the court to declare the Act constitutional. UTU also filed a counterclaim in the carriers' action arguing that the designation of BLE as the exclusive representative of all engineers violated 45 U.S.C. § 153 First(i)'s provision that on property grievances "shall be handled in the usual manner." The court eventually consolidated the two cases and held that the Act was constitutionally valid and that the court lacked jurisdiction to decide the dispute over BLE's exclusive representation. Although UTU has dropped its Takings Clause claim, it appeals the district court's disposition of the crew consist and representation issues.

## II.

UTU contends that Congress exceeded its Commerce Clause power by reopening the crew consist arrangements. It concedes, however, as it must, that Congress' general effort to resolve the railroad labor dispute was a legitimate exercise of its Commerce Clause power. *See, e.g., Wilson v. New*, 243 U.S. 332, 37 S.Ct. 298, 61 L.Ed. 755 (1917); *see also Railway Employes' Dep't v. Hanson*, 351 U.S. 225, 233, 76 S.Ct. 714, 718, 100 L.Ed. 1112 (1956) ("Congress has authority to adopt all appropriate measures to 'facilitate the amicable settlement of disputes which threaten the service of the necessary agencies of interstate transportation.'") (quoting *Texas & New Orleans R.R. Co. v. Brotherhood of Ry. & Steamship Clerks*, 281 U.S. 548, 570, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930)). UTU argues, however, that the specific decision to reopen the crew consist arrangements is not rationally related to Congress' purported end of resolving the labor dispute. Although we review Congress' exercise of its Commerce Clause power extremely deferentially, the clause is still nevertheless justiciable—"[w]e must ensure only that the means selected by Congress are 'reasonably adapted to the end permitted by the Constitution.'" *Preseault v. ICC*, 494 U.S. 1, 17, 110 S.Ct. 914, 924, 108 L.Ed.2d 1 (1990) (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981)). UTU contends that because the moratorium agreements took the crew consist issue out of national bargaining, a strike could not have occurred over that question. Therefore, the Act's interference with the agreements does not rationally further the goal of ending the strike.

This argument is—to be charitable—not particularly weighty. That the moratorium agreements nominally froze the crew consist arrangements and therefore the carriers could not unilaterally seek to modify them did not, and could not, prevent the carriers from putting forth their alterna-

tive offer—which would have provided relatively more favorable wages in return for UTU's agreement to reopen the crew consist issue. Manning requirements and wages, after all, are simply two components of overall labor costs. The union had every legal right to reject the carriers' proposal, but neither the PEB nor Congress was obliged to ignore the underlying economic factors that were driving the dispute. UTU had no constitutional right to prevent *Congress* from reopening the crew consist issue, and it is almost frivolous to suggest that Congress behaved irrationally in doing so. *See Brotherhood of Locomotive Engineers v. Chicago, Rock Island & Pac. R.R. Co.*, 382 U.S. 423, 429, 86 S.Ct. 594, 597, 15 L.Ed.2d 501 (1966) ("Congress unquestionably has power under the Commerce Clause to regulate the number of employees who shall be used to man trains used in interstate commerce.").[1]

### III.

■ Appellant's alternative statutory argument—that the Act's adoption of the final report's recommendation that "the BLE have exclusive representation for all purposes of all employees in the craft or class to which it has been certified or recognized" was not meant to override the RLA—is not so easily dismissed. Appellant emphasizes that the RLA provides that grievances "shall be handled in the usual manner," 45 U.S.C. § 153 First(i), and that agreements between the UTU and the carriers in force when the Act was passed always had authorized UTU to represent its engineer members (whose certified representative was the BLE) in on property grievance proceedings. If Congress had wished to modify the specific terms of the RLA, appellant argues, the Act would have explicitly done so. The carriers, on the other hand, respond with considerable force that the Act implicitly, but necessarily, amended the RLA—at least with respect to the collective bargaining arrangements that the Act imposed. Both sides see this as a straightforward matter of statutory interpretation and urge us therefore to decide the question. The district court concluded, however, that the question presented implicated "representation" considerations committed to the NMB's exclusive jurisdiction under the RLA (45 U.S.C. § 152, Third, Fourth, and Ninth), and that therefore it lacked subject matter jurisdiction to resolve the controversy.

The government (the Justice Department) did not take a position below concerning the court's subject matter jurisdiction, ostensibly because it was not initially a party to the carriers' declaratory judgment action in which UTU raised its statutory argument as a counterclaim. The government had defended the constitutionality of the Act in the separate proceeding brought by the UTU which was subsequently consolidated, after briefing of the representation matter, with the carriers' action. On appeal, however, the government urges us to affirm the district court's determination but on a somewhat different basis. The government contends that whether this issue is a representation dispute under NMB's exclusive jurisdiction should be determined, in the first instance, by the NMB itself, which has not yet been asked to express an opinion on the matter. The government, in other words, asserts that the NMB has mandatory primary jurisdiction to determine whether it has exclusive jurisdiction. We think the government is right, although ironically it may well be that the ultimate statutory issue is a good deal easier to resolve than the question of whether this case is a representation dispute within the meaning of the RLA.

■ It is common ground that the NMB has exclusive jurisdiction over representation disputes that call for it to certify which of two unions is entitled to represent employees under the RLA. *See* 45 U.S.C.

---

1. Perhaps even more feckless is appellant's argument that the PEB's recommendation concerning crew consist was outside its jurisdiction (because it was a local not a national issue), and therefore Congress' adoption of the report was somehow constitutionally improper. Congress can, of course, incorporate recommendations into legislation from whatever source it wishes.

§ 152 Ninth; *Switchmen's Union of North America v. NMB*, 320 U.S. 297, 305, 64 S.Ct. 95, 99, 88 L.Ed. 61 (1943). Indeed, the NMB's authority is so extensive that the federal judiciary is virtually forbidden to review Board determinations. *Id.; International Ass'n of Machinists & Aerospace Workers v. NMB*, 930 F.2d 45, 48 (D.C.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 173, 116 L.Ed.2d 136 (1991). But the interpretation and enforcement of collective bargaining disputes (so called minor disputes) under the RLA follow a different route. *See, e.g., International Bhd. of Teamsters v. Texas Int'l Airlines, Inc.*, 717 F.2d 157, 158–59 (5th Cir.1983) (noting that minor disputes under the RLA are subject to arbitration through system boards of adjustment). Accordingly, even some cases which involve "representation issues" do not fall within the NMB's exclusive jurisdiction. *E.g., Association of Flight Attendants v. Delta Air Lines, Inc.*, 879 F.2d 906, 915–17 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990). In *Delta*, we held that the NMB's exclusive jurisdiction did not foreclose the district court from compelling arbitration for a damages claim based on an alleged violation of the successorship clause of a collective bargaining agreement, even though the arbitrator might need to discuss the current representational status of the union. We concluded that the district court could order arbitration because allowing the damages remedy was not the functional equivalent of resolving the representation dispute. *Id.*

The question of whether UTU should represent its member engineers pursuant to the RLA or BLE should represent them pursuant to the Act is neither a pure representation dispute nor a mere representation issue. None of the parties can point to a case in which the NMB has exercised authority over a claim raising similar issues under the same RLA provision.[2] On the other hand, no one before us has adequately explained why the NMB necessarily would refuse to entertain a case that is similar to other disputes with which it deals. We are frankly uncertain whether the NMB would, or should, have exercised jurisdiction over this case if it had been brought before it. The question presented in this case can therefore be described as arguably a representation dispute.

■ We think the proper course for a federal court faced with an "arguable representation dispute" is to recognize that the NMB has primary jurisdiction to determine whether it has exclusive jurisdiction over the dispute. *Cf. San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959) (NLRB has primary jurisdiction which preempts state court jurisdiction over conduct that is "arguably" subject to the National Labor Relations Act).[3] For those representation disputes over which the NMB has exclusive jurisdiction, Congress has recognized the NMB's special expertise to interpret the RLA. Indeed, we have described the scope of judicial review of NMB decisions as "one of the narrowest

---

**2.** UTU brought its counterclaim under section three of the RLA and contends that the NMB has exclusive jurisdiction only over section two claims. If BLE had initiated this action rather than UTU, however, it would have proceeded under section two. We therefore reject UTU's purported distinction because we do not think that the fortuity of which union initiated the action should necessarily determine whether the NMB has exclusive jurisdiction.

**3.** Unlike the Supreme Court's decision in *Garmon*, in which the goal of utilizing the NLRB's special expertise was intertwined with a desire to maintain the supremacy of federal labor law,

our primary jurisdiction holding does not create a potential jurisdictional gap. Under *Garmon*, for example, if management complained about conduct which a federal court felt was arguably protected by the NLRA, but the NLRB declined to exercise its jurisdiction, then a state remedy would be preempted. *See Garmon*, 359 U.S. at 245–46, 79 S.Ct. at 779–80. Management, in that case, would not have an available forum at either the state or federal level. Here, by contrast, we need not worry about federalism concerns because all of the relevant forums are federal.

known to the law." *International Ass'n of Machinists & Aerospace Workers v. Trans World Airlines*, 839 F.2d 809, 811 (D.C.Cir.), *amended*, 848 F.2d 232 (D.C.Cir.), *cert. denied*, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988). It follows *a fortiori* that the NMB has unique competence to determine the threshold question of whether a case involves matters within its exclusive jurisdiction. *Cf. National Labor Relations Board v. City Disposal Sys.*, 465 U.S. 822, 829, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984) (reaffirming that the NLRB should determine the scope of its authority under § 7 of the NLRA in the first instance). The NMB's expertise and policy-making responsibility may well be brought to bear on its determination of the facts of the case or its reading of collective bargaining agreements as well as its interpretation of the statute.[4] We therefore think that the district court correctly dismissed UTU's counterclaim because of the NMB's primary jurisdiction.

\* \* \* \* \* \*

 Of course our decision that the NMB has primary jurisdiction does not foreclose us from exercising jurisdiction over this matter at a later stage. If the NMB decides that it does not have exclusive jurisdiction over this dispute, UTU can renew its action in the district court at that time. With that understanding, the decision of the district court is affirmed.

*So Ordered.*

---

**4.** By so holding we do not mean to resolve definitively the question reserved in this court, whether under *Chevron* the judiciary should defer to an agency's construction of "a statute 'delimiting its jurisdiction'" (which may not describe the statute involved here). *Public Utilities Comm'n v. FERC*, 900 F.2d 269, 275 n. 5 (D.C.Cir.1990) (quoting *New York Shipping Ass'n v. Federal Maritime Comm'n*, 854 F.2d 1338, 1363 (D.C.Cir.1988), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 866, 102 L.Ed.2d 990 (1989)). *But see Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354, 381, 108 S.Ct. 2428, 2444, 101

L.Ed.2d 322 (Scalia, J., concurring) ("deference applies even to an agency's interpretation of its own statutory authority or jurisdiction"); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844–45, 106 S.Ct. 3245, 3253, 92 L.Ed.2d 675 (1986); *City Disposal*, 465 at 830 n. 7, 104 S.Ct. at 1510 n. 7. If NMB were to exercise (or not exercise) jurisdiction based on its interpretation of the statute, and that interpretation were to be challenged, we would then be obliged to decide whether deference is appropriate.