UNITED TRANSPORTATION UNION, Petitioner,

v.

ILLINOIS CENTRAL RAILROAD, Respondent,

and

Brotherhood of Locomotive Engineers, Respondent–Intervenor.

No. 97 C 2128.

United States District Court, N.D. Illinois, Eastern Division.

March 11, 1998.

---

Patrick Joseph Harrington, Harrington, Thompson, Acker & Harrington, Ltd., Chicago, IL, Kevin C. Brodar, United Transportation Union, Cleveland, OH, for United Transportation Union.

Ronald A. Lane, Illinois Central Railroad Company, Edward Nathan Druck, Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C., Chicago, IL, for Illinois Central Railroad.

William Liasson Phillips, William L. Phillips, Chicago, IL, Harold A. Ross, Ross & Kraushaar, Cleveland, OH, for Brotherhood of Locomotive Engineers.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Although this case is now before the court on United Transportation Union's (UTU) petition to enforce an arbitrator's award under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, it has a long history. It stems from the historic disputes between UTU and respondent Brotherhood of Locomotive Engineers (BLE) regarding the representation of railroad employees. BLE represents locomotive engineers, while UTU represents locomotive firemen.

This particular case arose out of agreements between the unions and Illinois Central Railroad (IC) governing use of "extra boards" as a means of regulating the "ebb and flow" of firemen into and out of the ranks of engineers. Essentially, UTU argues that in 1986 BLE entered into an agreement that allowed IC to establish "guaranteed" extra boards in violation of an earlier tri-partite agreement between IC, UTU, and BLE that had set up "mileage" extra boards. UTU sued to enjoin the 1986 agreement, but the district court held that the issue was a "minor dispute" under the IC and the court was therefore without subject matter jurisdiction to resolve it. *United Transportation Union v. Illinois Central Gulf Railroad Company,* No. 87–C–3845 at 16 (S.D.Ill. Oct. 31, 1988) (hereinafter, *UTU v. ICGRC* ).

As a minor dispute, the matter proceeded to arbitration before Public Law Board (PLB) 4685. On April 24, 1995, the PLB issued its decision resolving the issue "in accordance with the position advocated by UTU." On March 27, 1997, UTU filed the instant petition to enforce the PLB's decision against IC. UTU then filed a motion for summary judgment which generated cross-motions from both IC and BLE, as respondent-intervenor. UTU claims that jurisdiction is proper pursuant to Section 3 First (p) of the Railway Labor Act, 45 U.S.C. § 153 First (p), and 28 U.S.C. §§ 1331 and 1337. For the reasons stated herein, we grant UTU's motion for summary judgment and deny IC's and BLE's motions for summary judgment.

## BACKGROUND

UTU is an unincorporated railway labor organization with its principal place of business in Cleveland, Ohio, which claims it is the duly designated collective bargaining representative of IC employees working as firemen. IC is a corporation engaged in the interstate transportation of goods by rail with its principal offices in Chicago, Illinois, and is subject to the provisions of the Railway Labor Act. BLE is and has been the duly certified collective bargaining representative for the craft of locomotive engineers at IC.

Historically, engineer service employees of IC have worked as either engineers or firemen, depending on the volume of IC busi-

ness and the number of temporary vacancies among engineers. Locomotive engineers came from the ranks of firemen or were qualified engineers from another railroad. An employee hired as a fireman was promoted to engineer after on-the-job training and passing required examinations. The first regular work as an engineer performed by a fireman who had qualified to enter the rank of engineer was usually an assignment to the engineers' "extra boards." The extra boards were used by IC in order to fill vacancies in regularly assigned engineer positions which arose from sickness, vacations, or a surge in business. The names of extra engineers were listed on the boards and were called on a first-in/first-out basis, with the names being moved up as the engineers ahead received their assignments. The fireman who was "promoted" by being listed on the extra boards would generally be the fireman with the most seniority in the particular seniority district. The promoted fireman would receive a date on the engineers' seniority roster upon performing his first regular assignment as an engineer. If there were no vacancies, the engineers on the extra board would perform no service and receive no compensation. When the engineer vacancies were filled, the junior engineers would be demoted back to the rank of firemen, where they retained their seniority and took back firemen positions held by workers with less seniority.

In January 1960, IC entered into separate but identical agreements with UTU's predecessor (hereinafter collectively referred to as UTU) and BLE, regarding the regulation of the "ebb and flow" of engineers through the system of "mileage" extra boards (1960 agreements). Pursuant to these agreements, the extra boards were to be regulated such that the engineers on the lists were permitted to "accumulate between 4000 and 4800 miles in road passenger service, 3000 and 3800 miles in other road service, and 2600 and 3200 miles in yard service, or the equivalent thereof, in each thirty-day period" (UTU Reply to BLE's 12(M) Stmt. Ex. B). To accomplish these goals it was agreed that the mileage requirements would be checked and relevant adjustments made "at any time, but must be made on the first, eleventh, and twenty-first day of each calendar month" (id.). The agreements also provided that the number of engineers on the boards could be adjusted "by mutual consent" where business demands fluctuated (id.). The general rule was that when an individual engineer accumulated the maximum mileage figure in a one-month period, he was required to be laid off for the balance of the period if there were other engineers available to relieve him (id.).

The crux of the dispute in this case involves how two subsequent contracts affected the original 1960 agreements on extra boards. First, on October 31, 1985, the nation's railroads, including IC, entered into an agreement with UTU which provided that the "craft or class of firemen (helpers) shall be eliminated through attrition except to the extent necessary to provide the source for engineers and for designated passenger firemen, hostler and hostler helper positions. Trainmen shall become the source of supply for these positions as hereinafter provided" (McCoy Aff. Ex. A, Article XIII). UTU claims that until 1992 workers who were selected for engineer training continued to establish firemen seniority. BLE disagrees, stating that since October 31, 1985, workers becoming engineers have not accrued firemen seniority.

The second agreement was made in 1986. During the 1985 round of negotiations, BLE and the nation's railroads were unable to reach an agreement, and that dispute was submitted to interest arbitration before Arbitration Board No. 458, which issued its award and the agreement for the parties on May 19, 1986 (1986 agreement). This award contained Side Letter No. 20, which provided a provision for "guaranteed" extra boards. Carriers, like IC, were thereby granted the "right" to establish such boards, which guaranteed that each employee on the board would receive payment at "the equivalent of 3000 miles at the basic through freight rate for each calendar month unless the employee is assigned to an exclusive yard service extra board in which event the guarantee will be the equivalent of 22 days' pay at the minimum 5-day yard rate for each calendar month" (UTU Mot.Ex. 2 at 10). Thus, whereas engineers on the extra boards prior

to 1986 (even those regulated by mileage under the 1960 agreements) did not receive pay unless they actually worked, the extra boards provided for in Side Letter No. 20 guaranteed that the engineers on the boards would be paid irrespective of whether they worked.

Beginning in 1986, IC established engineers' guaranteed extra boards at several locations. On October 7, 1987, IC served notice that was going to establish an engineers' guaranteed extra board at East St. Louis. UTU protested that such an action, taken without the consent of UTU, violated the 1960 agreements. IC took the position that the establishment of the guaranteed extra board was authorized by the 1986 agreement and offered to arbitrate the following question:

> Does ·the establishment of Engineers' Guaranteed Extra Boards under the provision of the May 19, 1986 National Agreement with the Brotherhood of Locomotive Engineers violate the January 27, 1960 Tri–Party Agreement?

(IC 12(M) Stmt. ¶ 6). UTU declined to arbitrate, instead filing suit in the Southern District of Illinois asserting that the matter was a "major dispute" in that the proposed implementation of guaranteed extra boards changed the working conditions of the firemen under the 1960 agreements. On November 1, 1988, Judge Stiehl refused to grant an injunction, ruling that the dispute between the parties was a "minor dispute" and therefore subject to the exclusive jurisdiction of the National Railway Adjustment Board (Adjustment Board). *UTU v.ICGRC*, No. 87–C–3845 at 16.

On December 2, 1988, UTU requested IC to agree to establish a "Public Law Board" to address the dispute. The question which UTU proposed to be arbitrated was:

> Does the Illinois Central Railroad and the Brotherhood of Locomotive engineers have the right to change the mileage regulation of the Engineers' Extra Boards, as set forth in the January 27, 1960 Tri–Party

Agreement, without the concurance [sic] of the United Transportation Union?

(BLE 12(M) Stmt. ¶ 18). The arbitration agreement prepared by UTU and signed by IC required PLB 4685 to "make findings of fact and render an award on each case submitted to it, within ninety (90) days, if possible, after the close of the hearing of each case."

IC rejected UTU's request to establish the PLB, arguing that it had not changed the 1960 agreements because, to the extent that "mileage" boards were maintained, IC would continue to regulate them according to the 1960 rules. It was only where "guaranteed" boards were established that the 1960 agreements would not be utilized. As IC and UTU were unable to resolve what question was to be arbitrated, on March 9, 1989 UTU invoked the involuntary arbitration procedures of the Railway Labor Act. On April 10, 1989, the National Mediation Board established PLB No. 4685 and appointed a member to represent IC, a member to represent UTU, and a neutral, Richard R. Kasher (Kasher). A hearing was held on November· 29, 1989, where the PLB addressed the question posed by UTU. At the hearing, BLE was given an opportunity to present its version of the case.[1]

On April 24, 1995, a decision was circulated by neutral Kasher, stating, *inter alia,* that the "issue is resolved in accordance with the position advocated by the UTU." The parties dispute whether UTU attempted to seek IC's voluntary compliance with the award before filing this federal lawsuit. On March 27, 1997, UTU filed the instant petition seeking enforcement of the PLB's award.

· IC has now established guaranteed extra boards at all locations where it previously maintained unpaid mileage extra boards. Almost all firemen positions were terminated during the late 1980s, and since the early 1990s IC has not had any firemen positions. As a result, there is no longer an "ebb and flow" of locomotive workers between assignments as engineers and firemen.

---

1. The parties here dispute whether, as BLE argues, this opportunity was "limited" or, as UTU contends, "full and unrestricted."

## DISCUSSION

■ On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56. *Proviso Association of Retarded Citizens v. Village of Westchester*, 914 F.Supp. 1555, 1560 (N.D.Ill. 1996); *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind.) Pension Fund v. Kelly*, 1996 WL 507258, *3 (N.D.Ill. 1996). The traditional standards for summary judgment still apply even though both parties have moved for summary judgment. *Blum v. Fisher and Fisher, Attorneys at Law P.C.*, 961 F.Supp. 1218, 1222 (N.D.Ill. 1997). The court thus considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration. *Chicago Truck Drivers*, 1996 WL 507258 at *3.

Before we address the substance of the issues involved here, it is important to be clear about what is at stake. As stated above, in 1985 UTU and IC agreed to the elimination of the craft of firemen through attrition. Thus, at some point in time after 1985, it seems that IC would have been free to create the guaranteed extra boards since the class of firemen would have ceased to exist. What UTU now contends is that the 1986 agreement creating the guaranteed boards accelerated the time-frame for eliminating firemen in violation of both the 1960 agreement on mileage extra boards and the 1985 attrition agreement. It did so by over-staffing the guaranteed boards with firemen who received engineer wages. Those on the boards could not flow back down to the ranks of firemen and the class of firemen was thereby eliminated. However, on the guaranteed boards the firemen received less pay than if they would have been permitted to flow back down to the rank of firemen.

According to UTU, a group of firemen continued to exist after 1985, accruing seniority while continuing to flow back and forth between the ranks of engineers. BLE disputes this, stating instead that the firemen who became engineers stopped accruing firemen's seniority in 1985 and that the ebb-and-flow ceased by 1987. IC claims that the ebb and flow ceased in 1986. Nevertheless, it is undisputed that some firemen continued to exist after 1985, until the early 1990s, when the firemen were completely phased out (IC Stmt.of Add. ¶ 22). It is not clear exactly when the class of firemen would have been eliminated if natural attrition had run its course, but UTU's position is that it would not have been until well after the time the elimination actually occurred. Today, there are no more firemen working for IC. Thus, BLE and IC argue that even if the guaranteed extra boards were abolished and the mileage extra boards were reinstated, it would make no difference since there are no longer any firemen between which the engineers could ebb-and-flow pursuant to the 1985 agreement eliminating firemen by attrition. According to BLE, abolishing the guaranteed boards would result in engineers losing their jobs since those that are cut off the guaranteed extra boards would have no place to flow. UTU responds that abolishing the guaranteed boards would simply restore the mileage board system and allow at least 65 employees who have pre–1985 firemen seniority to exercise that seniority.

## I. "Minor" and "Representation" Disputes Under the Railway Labor Act

The initial point of contention between the parties in this case is whether the relationship between the 1960 agreements and the 1986 agreement between BLE and IC to establish guaranteed extra boards (Side Letter No. 20) involves a "minor" or "representation" dispute under the Railway Labor Act. UTU argues that the dispute is minor and was therefore properly decided by the PLB. IC and BLE argue that the dispute is representational and the PLB exceeded its jurisdiction by resolving it.

■ The Railway Labor Act defines three classes of labor disputes and provides different procedures for the resolution of each type of dispute. *United Transp. Union v. Gateway Western Ry. Co.*, 78 F.3d 1208, 1213 (7th Cir.1996). A "minor" dispute is a dispute growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions. *Chicago & North Western v. Railway Labor Executives' Ass'n*, 908

F.2d 144, 148 (7th Cir.1990), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). The test is whether the conflict can be resolved by reference to an existing agreement. *Atchison, Topeka & Santa Fe v. United Transportation Union,* 734 F.2d 317, 321 (7th Cir.1984) (*Atchison I*). If reference to an existing agreement resolves the disagreement, the dispute is considered minor unless the claims of contractual justification are "frivolous" or "obviously insubstantial." *National Railway Labor Conference v. International Ass'n of Machinists,* 830 F.2d 741, 746 (7th Cir.1987). Section 3 of the Act requires that minor disputes are to be finally decided through compulsory arbitration by the National Railroad Adjustment Board or a special adjustment board. 45 U.S.C. § 153; *see United Transportation Union v. Burlington Northern Ry. Co.,* 875 F.Supp. 468, 470 (N.D.Ill.1994). Under § 153 First (q), the findings and order of the division of the Adjustment Board are conclusive on the parties, but can be set aside, *inter alia,* for "failure ... to conform, or confine itself, to matters within the scope of the division's jurisdiction."

 A "major" dispute is one in which a party wants to change an existing collective bargaining agreement. *Chicago & North Western,* 908 F.2d at 148. A major dispute "is subject to section 6 of the Railway Labor Act, 45 U.S.C. § 156, and the parties are required to follow a long, drawn-out conciliation process, which includes negotiation between the parties, mediation by the National Mediation Board (NMB), and possibly a review and report by an emergency board appointed by the President." *National Railway Labor Conference,* 830 F.2d at 745.

 A "representation" dispute involves the composition of the collective bargaining unit and the identity of that unit's authorized representative for collective bargaining purposes. *Gateway,* 78 F.3d at 1213. Representation disputes are governed by section 2 Ninth of the Railway Labor Act, 45 U.S.C. § 152 Ninth, and they fall within the National Mediation Board's exclusive juris-

diction. *Switchmen's Union of North Am. v. National Mediation Bd.,* 320 U.S. 297, 305–06, 64 S.Ct. 95, 88 L.Ed. 61 (1943). Thus, once it is clear that a complaint alleges what is properly characterized as a representation dispute, the district court must dismiss the case for lack of subject matter jurisdiction. *Gateway,* 78 F.3d at 1213. Moreover, where the precise character of the dispute is in doubt, a federal court should not proceed, for "the NMB has primary jurisdiction to determine whether it has exclusive jurisdiction over the dispute." *United Trans. Union v. United States,* 987 F.2d 784, 789 (D.C.Cir. 1993).

On November 5, 1987, UTU brought suit against IC in the Southern District of Illinois, claiming that a "major" dispute had arisen between the parties with regard to IC's proposed implementation of guaranteed extra boards in East St. Louis, Illinois. Specifically, UTU argued that by agreeing to Side Letter No. 20 in 1986 the IC had changed the wages and working conditions of UTU members who were not given an opportunity to negotiate such changes, in violation of Section 2, First, of the Railway Labor Act, 45 U.S.C. § 152.[2] On November 1, 1988, the district court rejected UTU's argument, finding instead that the issue was whether the 1960 agreement between UTU and IC had been modified by the 1986 agreement between IC and BLE. Stating that this type of "three-cornered dispute" has traditionally been treated as "minor," *UTU v. ICGRC,* No. 87–C–3845, at 13, the court went on to find that since IC's claim of contractual authority for the implementation of the guaranteed extra boards was based upon its non-frivolous interpretation of the 1960 and 1986 agreements, the dispute was "minor" and therefore "subject to the exclusive jurisdiction of the National Railway Adjustment Board." *Id.* at 15–16.

Based on the district court's finding, UTU invoked the Adjustment Board's dispute resolution process governing minor disputes, *see* 45 U.S.C. § 153, by submitting the dispute to PLB 4685. The UTU claimed that IC and

---

**2.** IC argued that the establishment of the guaranteed extra boards was governed by the 1960 and 1986 agreements and therefore involved an issue of contract interpretation that was a minor dispute under the Railway Labor Act. IC did not argue that the dispute was representational.

BLE did not "have the right to change" the mileage regulation of the extra boards as set forth in the 1960 agreements, without its concurrence. On April 24, 1995, the PLB found that the 1986 agreement vitiated the rights of the UTU and the firemen it represented under the 1960 agreements, and that the dispute was "resolved in accordance with the position advocated by the UTU" (UTU Mot.Ex. 1 at 10).

Now, the tables have turned. In contrast to its earlier position, UTU now argues that the issue is a simple one of contract interpretation, that the PLB acted within its jurisdiction in resolving the conflict between the 1960 and 1986 agreements, and that this court is therefore bound to enforce the PLB's award, even if it rests on a mistaken interpretation of the underlying agreements. *See Skidmore v. Consolidated Rail Corp.*, 619 F.2d 157, 159 (2d Cir.1979), *cert. denied*, 449 U.S. 854, 101 S.Ct. 148, 66 L.Ed.2d 488 (1980). UTU further contends that the district court for the Southern District of Illinois has already concluded that this is a minor dispute, that UTU simply followed the established procedures by submitting the minor dispute to an arbitration panel, and that the PLB's award is final and not subject to the type of collateral jurisdictional attack that BLE and IC are making.

IC has also changed its position, although it maintains that this change does not reflect inconsistency, but rather is a response to the fact that the PLB's award exceeded its jurisdiction in violation of § 153 First (p). Specifically, IC contends that it was originally in agreement with the district court's conclusion in *UTU v. ICGRC*, No. 87–C–3845, that the three-cornered dispute between IC, BLE, and UTU involved an issue of contract interpretation and, as such, was properly designated a "minor" dispute within the province of the Adjustment Board. Had the arbitrator confined himself to the precise issue addressed by the district court—whether the 1986 agreement establishing guaranteed extra boards was consistent with the 1960 agreements governing

mileage extra boards—IC agrees it would have no basis to challenge the PLB's decision, except under the narrow grounds provided in the Railway Labor Act. 45 U.S.C. § 153 First (q). However, IC contends that the arbitrator overstepped his bounds when he instead addressed the question UTU proffered for resolution, which asked whether IC and BLE had the "right to change" the 1960 agreements without UTU's concurrence. This question, IC asserts, asked the arbitrator to define rights outside the collective bargaining agreement and thus presented a representation dispute, which was outside the arbitrator's jurisdiction. In particular, IC claims that the question posed asked the PLB to "define the scope of [BLE's] exclusive bargaining rights to represent engine services employees of IC who could or might work as firemen," (IC Mot. at 11), which is representation dispute.

BLE's argument is similar. It contends that the issues before PLB 4685 involved whether UTU or BLE could negotiate with IC upon the subject of guaranteed extra boards within and for the craft of locomotive engineers, which union should have the power to dictate the terms of the engineers' agreements, and which one had the right to regulate those boards when in existence. These issues, BLE claims, present a classic representation dispute since they involve the question of "who represents which workers." *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe*, 768 F.2d 914, 919 (7th Cir.1985) (*Atchison II*). BLE contends that by venturing into this representation dispute, PLB neutral Kasher exceeded his jurisdictional authority.

▮▮▮▮▮ Therefore, the issue we must decide is whether the question submitted by UTU and resolved by the PLB was simply another way of stating the minor dispute the district court found was "subject to the exclusive jurisdiction of the National Railway Adjustment Board," *UTU v. ICGRC*, No. 87–C–3845, at 16, or whether this question substantively changed the issue into a representation dispute.[3]

---

**3.** As an initial matter, UTU argues that BLE and IC are precluded from raising the issue of whether this case involves a representation dispute

since they failed to bring up this issue before the PLB. However, this argument is quickly disposed of since it is clear that a party can raise a

We find that even though neutral Kasher may have relied upon UTU's inartfully framed question in defining the conflict between the parties, he properly confined his analysis to interpreting the relationship between the 1986 and 1960 contracts, and therefore was well within his jurisdictional authority to resolve minor disputes. Kasher's decision focused on whether IC had the contractual authority, given the preexisting 1960 agreements governing the mileage extra boards, to unilaterally enter into the 1986 agreement with BLE establishing the guaranteed boards. It found that IC did not have the proper authority and therefore violated the 1960 agreements when it established the guaranteed extra boards. Disputes such as this—where the question is whether a later agreement substantively alters a preexisting agreement—have been consistently viewed as minor. *See Atchison I*, 734 F.2d at 321; *Atchison II*, 768 F.2d at 919.

For example, in *Atchison II*, the court was faced with a situation similar to the one we have here. Santa Fe and UTU had entered into an agreement which governed the promotion of firemen into the rank of engineer. 768 F.2d at 916–17. The agreement provided that no employee was eligible to be promoted to engineer without first entering service as a fireman, and that senior firemen retained their seniority over the junior firemen when both were promoted to engineers. *Id.* at 917. The dispute arose when Santa Fe hired new engineers from other districts, initially designated them as firemen, and then after a few months of training redesignated them as engineers, giving them seniority as engineers as of the date of redesignation. *Id.* A short time later, Santa Fe promoted a group of firemen to engineers, giving them seniority as engineers as of the date they had been hired as firemen. *Id.* BLE objected to this practice, arguing that by placing the firemen above the newly hired engineers on the seniority roster, the railroad had violated an agreement it had with BLE. *Id.* The court found that the dispute was a "three-cornered work-assignment" dispute that was a classic "minor" dispute. *Id.* at 919. It stated that since the disagreement was over the "relative seniority of different workers, and could hardly be resolved by a representation election," it was in fact a minor dispute that was subject to arbitration. *Id.*

Similarly, in *Atchison I*, UTU challenged an agreement entered into by Santa Fe and BLE which changed the method by which engineers accrued seniority in certain districts. 734 F.2d at 318. The UTU argued that the BLE agreement violated existing agreements between the UTU and Santa Fe. *Id.* at 318–19. The court found that since UTU's claims depended upon an interpretation of its rights under the existing agreements, the dispute was a minor one within the jurisdiction of the Adjustment Board. *Id.* at 321.

These cases control here. The UTU claims that the 1986 guaranteed board agreements violated the rights of firemen established under the 1960 agreements, and that IC and BLE were not contractually justified in unilaterally modifying the 1960 agreements. This is precisely the type of "three-cornered work-assignment" dispute which has been held to constitute a minor dispute under the Railway Labor Act. *Atchison II*,

challenge to the reviewing court's jurisdiction at any time during the proceedings. *See Kelly v. United States*, 29 F.3d 1107, 1113. Here, the grounds advanced by BLE and IC—namely, that this case involves a representation dispute which is within the exclusive jurisdiction of the National Medication Board—are jurisdictional and therefore were not waived by the parties' failure to raise them in the arbitration hearings. UTU's citations are not to the contrary since they deal with situations where courts have found that a party can waive its procedural (not jurisdictional) objections by failing to timely raise them during administrative hearings. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *Brotherhood*

*of Railway, Airline, and Steamship Clerks v. St. Louis Southwestern Ry.*, 676 F.2d 132 (5th Cir. 1982). This case involves the very different situation where the parties submitted an issue deemed a minor dispute to mandatory arbitration. The arbitrator proceeded to issue an award that BLE and IC now argue addressed a representation dispute (as opposed to the minor dispute to which he was supposed to confine himself) which was outside of his (and our) jurisdiction. Clearly, this court remains available as a forum in which BLE and IC can challenge the validity of the arbitrator's award based on the ground that he was without authority to make it. *See* 45 U.S.C. § 153 First (p).

768 F.2d at 919; *see also Brotherhood of Locomotive Firemen & Enginemen v. National Mediation Bd.*, 410 F.2d 1025, 1030 (D.C.Cir.1969). Moreover, in determining whether the dispute is minor, we need only find UTU has shown that its position is not frivolous or obviously insubstantial. *National Railway Labor Conference*, 830 F.2d at 746. We think that it has succeeded in doing so.

IC's and BLE's emphasis on the "right to change" language in the question UTU presented to the PLB is misplaced. They argue that the question asked the PLB to define the scope of BLE's bargaining rights and therefore, in fact, addressed a representation dispute. However, in its award the PLB focused its inquiry on the contract interpretation issue that was identified as a minor dispute by the district court. Neutral Kasher stated that there was "no dispute that the 1960 tripartite agreement(s) contained language which addressed, among other things, how *'extra engineers' lists shall be regulated"* (UTU Mot. Ex. 1 at 9) (emphasis in original). The 1986 agreement, Kasher continued, "did not vitiate the rights of the UTU and/or the employees it represents under the terms of the tripartite agreement to continue to obtain assignments on engineers' extra lists in accordance with the 1960 tripartite agreement ...." (*id.* at 10). It is clear that the PLB acted consistent with its mandate from the district court in finding that the 1986 agreement establishing the guaranteed extra boards improperly infringed upon the rights established in the 1960 tripartite agreements.

Clearly, the question presented to and analyzed by the PLB does not raise a representation dispute. There is no issue as to "who represents which workers," or "who can negotiate with the railroad regarding a specific issue." *Atchison II*, 768 F.2d at 919. It is understood that BLE bargains on behalf of engineers and UTU on behalf of firemen. When working as an engineer, an individual worker is represented by BLE; when working as a firemen, he is represented by UTU. There is no confusion about who is the appropriate representative and when that representative has the power to bargain on behalf of its workers. Rather, the issue here is

whether the result of BLE's bargaining with IC on behalf of engineers—the 1986 guaranteed extra boards agreement—violated the preexisting tri-partite agreement. Nothing would be resolved by holding a representation election since UTU is simply trying to enforce rights that it contends were established by the 1960 mileage boards agreement and vitiated by the 1986 agreement. As we stated above, that issue is a minor dispute subject to the procedures specified in 45 U.S.C. § 153.

The cases cited by IC and BLE are distinguishable. BLE, for example, relies heavily on *General Committee of Adjustment of Brotherhood Locomotive Engineers v. Missouri–Kansas–Texas R. Co.*, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943) (*M–K–T*). In that case the Supreme Court was faced with a dispute between the firemen's and engineers' unions. The engineers' union had entered into an agreement with the carrier regulating how engineers were to be called for emergency service. *Id.* 320 U.S. at 326. The firemen's union objected to this agreement and the matter was submitted to the National Mediation Board without the participation of the engineers. *Id.* The Board entered a mediation agreement that changed the practice respecting the handling of emergency engineers that had been previously established. *Id.* The engineers' union brought suit for declaratory relief, arguing that they should be declared the sole representative of the engineers, with the exclusive right to bargain for them. *Id.* at 327. The court declined to rule on this "jurisdictional dispute," finding instead that such disputes had been left by Congress to the exclusive jurisdiction of the National Mediation Board. *Id.* at 336.

The *M–K–T* case is not analogous to the one we are faced with here for the simple reason that it involved a clear-cut dispute about whether the engineers' union was entitled to bargain on behalf of its members with regard to the issue of emergency service. Unlike this case, the engineers' union in *M–K–T* had its agreement with the railroad abrogated by a National Mediation Board decision. There were no conflicting contracts governing the rights of firemen and

engineers that required interpretation. The question was not whether the emergency service agreement violated some preexisting agreement between the unions and the carrier, but rather whether the engineers' union was empowered to make such an agreement in the first place. Here, in contrast, the 1960 agreements governing the use of mileage extra boards were in place well before the BLE and IC contracted to establish the guaranteed boards. Thus, when the 1986 agreement was made, the issue was whether it infringed on rights previously established. Unlike *M–K–T*, there was never any question that BLE could properly bargain regarding the mileage boards on behalf of the engineers.

Neither are the other cases cited by BLE and IC applicable here. For instance, *Air Line Employees Ass'n v. Republic Airlines, Inc.*, 798 F.2d 967 (7th Cir.1986), *cert. denied*, 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986), involved a completely different situation where two airlines were about to merge and the surviving corporate entity, Northwest Airlines, had entered into a transition agreement with its unions permitting them to represent the newly-combined workforce of the post-merger entity. *Id.* at 967. This agreement excluded the union of the dissolved entity, Republic Airlines, and that union sought an injunction. *Id.* at 968. The court found that the dispute was representational and therefore within the jurisdiction of the National Mediation Board. *Id.* That case, however, had nothing to do with the issue of contract interpretation involved here since the sole question was which union was the proper representative of the merged airlines' workers. The same is true of *Gateway*, 78 F.3d at 1216 (finding that carrier's decision to create a subsidiary corporation to run a new rail line outside of the existing collective bargaining agreement raised a representation dispute), and *UTU v. United States*, 987 F.2d at 788–90 (finding that the claim by UTU that Congress' designation of BLE as exclusive bargaining representative of engineers, despite the fact that many engineers retained UTU membership, violated Railway Labor Act, raised a representation dispute).

Finally, IC makes a separate, although related, argument as to why the PLB's award exceeds its jurisdiction. IC agrees that it had no "right to change" the 1960 agreements without UTU's concurrence, but claims that that is not the issue here since the 1986 agreement did not affect the regulation of the mileage extra boards. The mileage boards were not "changed," according to IC. Rather, IC merely implemented an entirely new system of paid guaranteed extra boards. If IC had chosen to maintain the mileage boards concurrently with the guaranteed boards (which it concedes it has not done), then it claims that it would have continued to apply the rules governing mileage boards contained in the 1960 agreements. Therefore, it concludes, to the extent that the PLB departed from this rather straightforward contractual analysis and purported to define "rights" outside of the agreements, it exceeded its jurisdiction.

However, this argument is flawed. First, it is clear that the 1986 agreement did exactly what IC concedes it could not do—unilaterally alter the mileage extra board agreement. Whether or not IC wants to admit it, the effect of the 1986 agreement was to turn the 1960 agreement into a dead letter. Of course, IC had to abide by the terms of the 1960 agreement if it decided to maintain mileage boards, but the fact of the matter was that IC did not continue to use that type of board. Instead, it simply made an end-run around the 1960 agreement by establishing guaranteed boards which completely eliminated the mileage boards by placing firemen onto extra boards where they were guaranteed pay at engineers' wages. This arrangement had the effect of undermining the rights established under the mileage board agreement. This issue—whether one contract abrogates rights established under another—is clearly within the domain of contract interpretation. Accordingly, we find that the PLB did not exceed its jurisdiction by purporting to define the "rights" of the parties.

In conclusion, we find that the dispute addressed by PLB 4685 was a "minor" dispute under the Railway Labor Act and, as such, was properly within the PLB's jurisdic-

tion. We therefore reject IC's and BLE's argument that the PLB exceeded its jurisdiction by deciding a "representation" dispute. To the extent that IC and BLE have moved for summary judgment on this issue, we deny their motions.

## II. *Validity of PLB 4685's Award*

 Having resolved that the PLB acted within its jurisdiction in making its award, we must next determine whether the decision is enforceable under the Railway Labor Act. The Act empowers district courts to enforce Adjustment Board decisions. 45 U.S.C. § 153 First (p). That section provides that such orders may only be set aside on the following grounds: (1) failure of the Adjustment Board to comply with the requirements of the Railway Labor Act; (2) failure of the Adjustment Board to confine itself to matters within the scope of its jurisdiction; and (3) fraud or corruption. 45 U.S.C. § 153 First (p). Courts construing this provision have repeatedly emphasized the strict limitations on the review powers of the district courts, stating that the scope of review in proceedings to enforce a PLB award is among the narrowest in the law. *Brotherhood of R.R. Signalmen v. Louisville and Nashville R.R. Co.*, 688 F.2d 535, 542 (7th Cir.1982). Courts have interpreted the identical statutory language of § 153 First(q), which deals with judicial review of Adjustment Board decisions, to "mean[] just what it says." *Sheehan*, 439 U.S. at 93. Commenting on § 153 First (q), courts have found that the "question is not whether the Board erred, clearly erred or grossly erred in interpreting the contract, but whether it interpreted the contract at all." *American Train Dispatchers v. Norfolk & Western Ry.*, 937 F.2d 365, 366 (7th Cir.1991). This limited standard of review exists because "Congress intended minor grievances of railroad workers to be decided finally by the Railroad Adjustment Board." *Gunther v. San Diego & Arizona Eastern Ry. Co.*, 382 U.S. 257, 263, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965).

We have already found that PLB 4685 did the job it was assigned to do, that is, it interpreted the relationship between the 1960 and 1986 agreements. Specifically, it found

that the 1986 agreement could not vitiate the rights of UTU's members established under the 1960 agreements. Accordingly, we must grant UTU's motion for summary judgment and enforce the PLB's award under 45 U.S.C. § 153 First (p), unless it falls within one of the three categories described above.

### A. *Constitution of PLB 4685*

BLE argues that PLB 4685 was unlawfully constituted and therefore lacked jurisdiction to decide the issue presented by UTU. Specifically, BLE contends that it was improperly relegated to "interested party" status and excluded from (1) formulating the question to be addressed by the arbitration panel; (2) selecting the neutral member of the panel; and (3) arguing the matter through its panel member of the PLB in executive session, where, after all of the evidence has been heard and before the neutral member makes up his mind, the members of the PLB debate the merits of the case. BLE asserts that under *United Transp. Union E v. Burlington Northern, Inc.*, 470 F.2d 813, 815–16 (8th Cir.1972) (*BNI I*) and *General Comm. of Adjustment v. Burlington Northern, Inc.*, 563 F.2d 1279, 1284 (8th Cir.1977) (*BNI II*), it was entitled to full participation in the arbitration hearing, which means, among other things, that the PLB was required to include a member from BLE.

 UTU objects that BLE has waived this argument by failing to timely raise it. It cites *Brotherhood of Ry., Airline and Steamship Clerks v. St. Louis Southwestern Ry. Co.*, 676 F.2d 132 (5th Cir.1982), in support of this argument. In that case the court found that a Board's failure to notify an employee whose rights were likely to be affected by its hearing constituted a violation of the mandatory notice provision of § 153 First (j) of the Railway Labor Act. *Id.* at 136. However, the court went on to state that since the failure to comply with the notice requirement did not deprive the Board of its jurisdiction, and since the aggrieved employee failed to raise the issue during the Board's hearing, the procedural error had been waived. *Id.* at 136–37. The court, quoting *Brotherhood of R.R. Trainmen v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 380 F.2d 605, 608–09

(D.C.Cir.1967), *cert. denied,* 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967), stated as follows:

> Procedural objections to the action of an administrative agency or trial court must be timely made to give the tribunal an opportunity to correct the error, if error . there be; such contentions cannot first be made on appeal. It is imperative to an efficient and fair administration of justice that a litigant may not withhold his objections, await the outcome, and then complain that he was denied his rights if he does not approve the resulting decision.

*Id.* at 136. *See also United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952). *St. Louis Southwestern Ry.,* UTU contends, controls this case. We agree.

■ It is well established that parties to an arbitration may waive procedural defects by failing to bring such issues to the arbitrator's attention in time to allow the arbitrator an opportunity to cure the defects. *National Post Office Mailhandlers v. U.S. Postal Service,* 751 F.2d 834, 841 n. 4 (6th Cir.1985); *Order of Railway Conductors v. Clinchfield Railway Co.,* 407 F.2d 985, 988 (6th Cir.), *cert. denied,* 395 U.S. 841, 90 S.Ct. 104, 24 L.Ed.2d 92 (1969); *St. Louis Southwestern Ry.,* 676 F.2d at 136–38. BLE had notice of the hearing, filed a brief with the PLB, participated in the hearing, and had its position considered by the neutral. However, at no point prior to filing its intervenor motion in this case has BLE complained about the constitution of the PLB. Instead, BLE has delayed raising any objection to the composition of the PLB or its exclusion from full participation in the hearing until now, almost eight years after the PLB conducted its original hearing. This type of dilatory behavior renders BLE's argument an "afterthought, brought forward at the last possible moment to undo" the arbitrator's award "without con-

sideration of the merits ...." *L.A. Tucker,* 344 U.S. at 36. Therefore, we find that BLE has waived its objections as to the composition of the PLB.[4]

We think that *BNI I* and *BNI II* are not to the contrary. In *BNI I,* the court indicated that where a Board was convened to interpret contractual language common to collective bargaining agreements binding both the BLE and UTU, both parties had the right to participate in the hearing before the board. However, in that case, no waiver issue was ever raised or considered. In *BNI II* the dispute arose over whether UTU could require the carrier to submit a merger-related dispute to a PLB *before* the PLB had even been convened. 563 F.2d at 1281. This is clearly not precedent for the case we are faced with here.

Neither does *Brotherhood of Locomotive Engineers v. Union Pacific Ry. Co.,* No. 91–C–1955 (E.D. Mo. April 15, 1996) (McCoy Decl. Ex. N) help BLE on this point. In that case, the district court found that BLE had not waived its objections regarding its exclusion from the composition of a Board by waiting until the hearing before the Board to present them. Specifically, the court found that "plaintiffs presented their objections at a time when, had the Board found the objections meritorious, the Board had an opportunity to grant plaintiffs relief prior to consideration and resolution of the merits of the issue(s) before the Board." *Id.* at 15. Therefore, the court found the objections were not waived. *Id.* Here, not only did BLE fail to object to the composition of the Board during the hearing, it actively participated in the hearing, presented its position, and kept silent about its purported misgivings until it decided to intervene in the present case approximately eight years after the Board was convened. This, we think, clearly constitutes an instance of procedural default.

---

4. We do not find that the issues BLE raises are jurisdictional and hence non-waivable. In *St. Louis Southwestern Ry.,* the court found that a PLB's failure to comply with the statutory notice requirement did not affect its jurisdiction to render a binding award. 676 F.2d at 138. If a PLB does not abdicate its jurisdiction by failing to notify an aggrieved party of the proceedings, we do not see how it can do so in a case such as this,

where the BLE was notified and permitted to participate, but excluded from selecting the panel members. The only authority BLE presents in support of its assertion that it was entitled to have one of its representatives on the PLB is *BNI I,* 470 F.2d at 815, and *BNI II,* 563 F.2d at 1284. However, these cases do not establish that the composition of a PLB is a non-waivable jurisdictional issue.

*See St. Louis Southwestern Ry.,* 676 F.2d at 137.

### B. *Timeliness of PLB 4685's Award*

Next, BLE and IC both argue that the PLB's judgment should be set aside due to the PLB's failure to render a timely award. The agreement establishing PLB 4685 provided that the Board "shall make findings of fact and render an award on each case submitted to it, within ninety (90) days, if possible, after close of the hearing of each case ...." (McCoy Decl. Ex. I, ¶ I). Since the PLB heard the matter on November 29, 1989, and did not render a decision until April 24, 1995, the 90–day limit was clearly exceeded.

 Although it is true that a PLB can lose its jurisdiction to render an award if it does not do so within a "reasonable time" after the original time limitation provided for in the agreement, *Jones v. St. Louis–San Francisco Ry. Co.,* 728 F.2d 257, 265 (6th Cir.1984), the general rule is that "[u]nless the agreement itself makes the deadline jurisdictional, a party's failure to complain about delay before the award is made forfeits his right to challenge the timeliness of the award." *Hill v. Norfolk and Western Ry. Co.,* 814 F.2d 1192, 1199 (7th Cir.1987); *see also McKesson Corp. v. Local 150 IBT,* 969 F.2d 831, 834 (9th Cir.1992); *West Rock Lodge No. 2120 v. Geometric Tool Co.,* 406 F.2d 284, 286 (2d Cir.1968). Here, IC and BLE have waived the right to challenge the timeliness of the PLB's award by their failure to complain until now. BLE contends that since IC did complain about the timeliness issue in 1993 (Gibbins Aff. Ex. 20), an "objection" was made on behalf of IC and

BLE that renders the award invalid under *St. Louis–San Francisco Ry. Co.,* 728 F.2d at 266. However, the correspondence cited as evidence of this "complaint" is simply a letter from IC responding to a letter by UTU making additional arguments in support of its position to neutral Kasher. Nowhere does it indicate any objection to the untimeliness of the neutral's decision.[5] For this reason, we find that BLE and IC have waived their timeliness argument, and we deny their motions for summary judgment on this basis.

### C. *Vagueness of PLB 4685's Award*

 Finally, BLE and IC both argue that the PLB's decision should be set aside because it is unenforceably vague. They argue that the award merely states that "[t]he issue is resolved in accordance with the position advocated by UTU," and thus is no different than the award in *Railroad Yardmasters v. Indiana Harbor Belt R. Co.,* 166 F.2d 326 (7th Cir.1948), which read, "complaint disposed of per findings," and was set aside by the Seventh Circuit. *Id.* at 329. We disagree. As we have stated many times in this opinion, we think that the PLB's decision adequately explained that the basis for its decision was the conflict between the 1960 and 1986 agreements. BLE and IC mischaracterize the award when they say that it simply ordered the issue resolved in accordance with UTU's position. In fact, the Board specifically found that IC and BLE agreed to a different manner of regulating the engineers' extra boards that undercut the rights of the UTU and its employees, established under the terms of the 1960 tripartite agreement.[6] The PLB went on to find that

5. In the letter, IC refers to UTU's attempt to submit the award from a different PLB concerning the "identical issue" involved in this case. IC states that it is "inappropriate to submit an award at such a late date when the record is closed." (Gibbins Aff. Ex. 20). However, this is not an objection to the untimeliness of the arbitrator's award, but rather it is a complaint about UTU's attempt to submit evidence in an untimely manner.

6. The exact language used by the PLB is as follows:

> The fact that this Carrier, as part of national negotiations, agreed with the BLE to a differ-

ent manner by which engineers' extra lists would be regulated did not vitiate the rights of the UTU and/or the employees it represents under the terms of the tripartite agreement to continue to obtain assignments on engineers' extra lists in accordance with the 1960 tripartite agreement using the calculation method for such extra board assignments.

&ast; &ast; &ast; &ast; &ast; &ast;

Accordingly, the Board concludes that the Carrier and the BLE did not have the right to change the mileage regulation of engineers' extra boards as set forth in the January 27, 1960 tripartite agreement without the UTU's

the question presented—whether the IC and BLE had the "right to change" the 1960 mileage agreement—was answered in UTU's favor, in the negative. Far from vaguely basing its award on some unexplained "findings," neutral Kasher found that the 1986 agreement violated the 1960 agreements and therefore was invalid. We therefore deny BLE's and IC's motions for summary judgment on this point.

With respect to the implementation of the award, both IC and BLE claim to be at a loss regarding how the order would be specifically enforced. IC asks whether it has to rescind the wage and benefit changes it implemented ten years ago, and expresses concern over the fate of the engineers who, if cut off the guaranteed boards, would have no place to flow. Both BLE and IC assert that the award simply cannot be implemented since there are no longer any firemen at IC. However, the PLB's order decided one thing very clearly: the 1986 agreement, insofar as it established guaranteed boards, violated the 1960 agreement and is therefore invalid. As we have found that the arbitrator acted in a manner consistent with the Railway Labor Act in making this award, we must enforce this order. Should the parties require clarification regarding the precise scope of the award, we think that their queries are more properly directed to the Adjustment Board. *See* 45 U.S.C. § 153 First (m) (stating that if a dispute arises involving an interpretation of the Board's award, "the division of the Board upon request of either party shall interpret the award in light of the dispute").

### CONCLUSION

For the foregoing reasons, we grant UTU's motion for summary judgment and deny BLE's and IC's motions for summary judgment.

concurrence; and thus the question at issue is answered, in the UTU's favor, in the negative.